# SUPPLEMENT.

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

Without attempting to define the limits of the power of the General Court in Massachusetts to control the right of its inhabitants to make contracts generally, the Justices cannot say that a statute requiring manufacturers to pay the wages of their employees weekly is not one which the General Court has the constitutional power to pass, if it deems it expedient so to do.

THE following order was adopted by the House of Representatives on April 15, 1895, and thereupon transmitted to the Justices of the Supreme Judicial Court, who, on May 6, 1895, returned the opinion which is subjoined.

Ordered, that the Justices of the Supreme Judicial Court be required to give their opinion to the House of Representatives upon the following important question of law:

Is it within the constitutional power of the Legislature to extend the application of the present law, relative to the weekly payment of wages by corporations, to private individuals and partnerships, as provided in the bill entitled "An Act relative to the weekly payment of wages," now pending before the General Court?

Ordered, that a copy of said bill be transmitted to said Justices for their information.

The copy of the bill was as follows:

AN ACT RELATIVE TO THE WEEKLY PAYMENT OF WAGES.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

Section 1. Sections fifty-one to fifty-four, inclusive, of chapter five hundred and eight of the acts of the year eighteen hundred and ninety-four, relative to the weekly payment of wages by corporations, shall apply to any person or partnership engaged in this Commonwealth in any manufacturing business and having more than twenty-five employees. And the word "corporation," as used in said sections, shall include such persons and partnerships.

Section 2. This act shall take effect upon its passage.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts :

We, the Justices of the Supreme Judicial Court, received, · on the 20th ultimo, your resolution, a copy of which is annexed, and in reply we respectfully submit the following opinion.

Your question implies that in your opinion the present law relating to the weekly payment of wages by certain corporations to their employees is constitutional, and your inquiry is whether it is within the constitutional power of the Legislature to extend the law to private individuals and to partnerships.

We are not informed of the nature of the doubts which your request implies. It is well known that in some of the States of this country legislation similar to that proposed has been held unconstitutional by the courts, sometimes on the ground that it is partial in its character, but more frequently on the ground that it interferes with what is called the liberty of contract, which, it is said, either as a privilege or as property, is secured to the inhabitants of a State by its Constitution, or by the Constitution of the United States. In some of these decisions a distinction has been suggested or made between the rights of natural persons and the rights of corporations, and such legislation has been deemed valid with respect to corporations whose charters were subject to alteration, amendment, or repeal by the Legislature, or which, being foreign corporations, were permitted to do business in the State under such conditions as the Legislature might impose, while the legislation has been deemed void with respect to natural persons. Some recent decisions on this subject are the following : *Leep* v. *St. Louis, Iron Mountain, &*

*Southern Railway*, 58 Ark. 407; *State* v. *Peel Splint Coal Co.*
36 W. Va. 802; *Hancock* v. *Yaden*, 121 Ind. 366; *State* v. *Brown
& Sharpe Manuf. Co.* 18 R. I. 11; *Shaffer* v. *Union Mining Co.*
55 Md. 74; *Tilt* v. *People*, Illinois, March 14, 1895.*

The legislative power granted to the General Court by the
Constitution of Massachusetts is perhaps more comprehensive
than that found in the constitutions of some of the other
States.    The Constitution of Massachusetts, c. 1, § 1, art. 4,
provides as follows: "And further, full power and author-
ity are hereby given and granted to the said General Court,
from time to time to make, ordain, and establish all manner
of wholesome and reasonable orders, laws, statutes, and ordi-
nances, directions and instructions, either with penalties or
without, so as the same be not repugnant or contrary to
this Constitution, as they shall judge to be for the good
and welfare of this Commonwealth, and for the government
and ordering thereof, and of the subjects of the same, and
for the necessary support and defence of the government
thereof," etc.    This provision was taken substantially from
the Province Charter.    There is not in the Constitution of
Massachusetts anything which in terms relates to the freedom
or liberty of contract, as there is concerning the liberty of
the press.    The Constitution declares that "All men are born
free and equal, and have certain natural, essential, and un-
alienable rights; among which may be reckoned the right of
enjoying and defending their lives and liberties; that of ac-
quiring, possessing, and protecting property; in fine, that of
seeking and obtaining their safety and happiness."    And it is
also declared that "no subject shall be arrested, imprisoned,
despoiled or deprived of his property, immunities, or privileges,
put out of the protection of the law, exiled, or deprived of his
life, liberty, or estate, but by the judgment of his peers, or
the law of the land."    Declaration of Rights, art. 1 and 12.
This last declaration was taken from Magna Charta, and in sub-
stance it has been incorporated in the 14th Amendment of the
Constitution of the United States, in form as follows: "No
State shall make or enforce any law which shall abridge the

---

* See *Ritchie* v. *People*, 155 Ill. 98.

privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

In legal nomenclature, at the time of the adoption of the Constitution of Massachusetts, the right to make a contract for personal services, if it can be regarded either as property or as a liberty or privilege, would perhaps have been regarded as the latter. So far as we are aware, the capacity to make such a contract was not, in the discussions concerning the Constitution, ever spoken of as property, although that capacity may be necessary to the acquisition of property. The statutes existing in England at the time of the adoption of the Constitution, regulating the employment of servants or laborers, were of ancient origin. The modern English statutes concerning the regulation of employment in factories undoubtedly rest on somewhat different political and economical principles from those formerly entertained. In Massachusetts, after the Province became an independent State, and before the adoption of the Constitution, the General Court passed laws regulating minutely the prices of commodities, and in certain respects the prices of labor. Prov. Sts. 1776–77, cc. 14, 46 ; 5 Prov. Laws (State ed.), 583, 642. It never has been much considered by the courts of Massachusetts how far the provisions of the Declaration of Rights in the Constitution have limited the power of the General Court with respect to such legislation, but it generally has been thought that this power under the Constitution is subject to some substantial limitations.

There never has been at any time in Massachusetts an absolute right in its inhabitants to make all such contracts as they pleased. Some contracts have always been held void at common law, and some contracts valid at common law have been declared void by statute. Married women at common law were under a general disability to make contracts during coverture; and, although they have been recently empowered by the statutes to make contracts as if they were unmarried, still at the present time husband and wife cannot make contracts with each other, and, if the statutes were repealed, the powers of married women to make contracts would be governed by the

common law. Marriage brokage and *post obit* bonds and covenants in restraint of trade sometimes have been held void. Minors at common law are under a disability to make contracts except for necessaries; and this is said to be for their protection. Our statute of frauds prevents the enforcement in the courts of many kinds of contracts, unless they are shown by a writing, and prohibits the making of certain contracts; and this statute was passed for the protection of persons against fraud and perjury. Seamen sometimes have been regarded as a class of persons who could not be trusted to make their own contracts without supervision, and statutes have been passed making regulations concerning their wages and shipping contracts. U. S. Rev. Sts. §§ 4501–4612. Wages to a certain amount due for personal labor and services have been exempted from attachment, probably on the ground that it was thought that workmen generally need their wages for their support. Usury laws furnish perhaps the best known illustration of the regulation by statute of the price to be paid for the use of a commodity; but the validity of these laws usually has been regarded as an exception to a general rule. The Public Statutes of Massachusetts, Title 12, entitled " Of the regulation of trade in certain cases," show various forms of interference by the Legislature with what may be called the freedom of trade or of contracts concerning the sale of commodities. The regulation of the subject of fire insurance, and the prohibition of the sale of oleomargarine made in imitation of yellow butter, and the requirement that an agreement to make a will must be in writing, are some of the most recent instances in Massachusetts of the prohibition or regulation of contracts by statute. The constitutionality of much of this legislation never has been questioned, and when questioned it generally has been sustained.

The Supreme Court of the United States has recently considered the constitutionality of the act of Congress of June 27, 1890, making it a misdemeanor for an attorney to receive more than ten dollars for prosecuting a claim for a pension, and has decided the statute to be constitutional. In *Frisbie* v. *United States*, 157 U. S. 160, that court say : " While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet

such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence; and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property." See *Wolcott* v. *Frissell*, 134 Mass. 1.

In *Commonwealth* v. *Hamilton Manuf. Co.* 120 Mass. 383, the court of which we are now the justices decided that the statute of 1874, c. 221, was constitutional. The provision which it was contended was unconstitutional was that " No minor under the age of eighteen years, and no woman over that age, shall be employed in laboring by any person, firm, or corporation in any manufacturing establishment in this Commonwealth more than ten hours in any one day," except in certain cases; and that " in no case shall the hours of labor exceed sixty per week." The decision of the case did not turn upon the fact that the defendant was a corporation of this Commonwealth, organized under St. 1824, c. 44. The court say: " There can be no doubt that such legislation may be maintained either as a health or police regulation, if it were necessary to resort to either of those sources for power. This principle has been so frequently recognized in this Commonwealth that reference to the decisions is unnecessary."

In *Commonwealth* v. *Perry*, 155 Mass. 117, the statute of 1891, c. 125, § 1, was declared unconstitutional by a majority of the court. The principal ground of the decision is that the statute was an attempt " to compel payment under a contract of the price for good work when only inferior work is done"; and it is said that " the right to acquire, possess, and protect property includes the right to make reasonable contracts, which shall be under the protection of the law"; and that, if the statute be

held to permit the hiring of weavers " only upon terms that prompt payment shall be made of the price for good work, however badly their work may be done, and that the remedy of the employer for their derelictions shall be only by suits against them for damages, it is an interference with the right to make reasonable and proper contracts in conducting a legitimate business, which the Constitution guarantees to every one," etc.

The decisions of various courts of this country upon the authority of the Legislature of a State to prescribe rates for transportation by railroad companies, and, in some instances, for the use of elevators, have proceeded on the ground that these were public employments; and it is implied in all or nearly all of these decisions that the Legislature could not constitutionally prescribe the rates of compensation to be paid for services, or for the use of property, in exclusively private employments.

It is manifest, however, from the examples we have given, that the regulation of contracts by statute not amounting to a determination of rates or prices has not been confined to public employments or to business which may be said to be affected with a distinct public interest. The legislation on this subject relates to a great variety of contracts, and has been passed, some of it to promote the public health or the public morals or the public convenience, some of it for the protection of individuals against fraud, and some of it for the protection of classes of individuals against unfair or unconscionable dealing. The considerations which may influence the Legislature to determine what legislation of this character is required by good public policy, or, in the words of the Constitution, what laws are " for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same," are not for us to weigh, except so far as may be necessary to determine whether the legislation proposed is repugnant or contrary to the Constitution. The legislation on similar subjects in Great Britain, and in other foreign countries which have no written constitutions limiting the powers of the Legislature, is not in all respects pertinent to the present inquiry ; but, considering the history of legislation in England concerning servants or laborers from the

earliest times, and the statutes which in modern times have been passed in several foreign countries and in many of the States of this country regulating the employment of laborers in factories, we cannot say, as matter of law, that the legislation proposed is so plainly not wholesome or reasonable that the General Court may not judge it to be for the good and welfare of the Commonwealth. We know of no reason derived from the Constitution of the Commonwealth or of the United States why there must be a distinction made in respect to such legislation between corporations and persons engaged in manufacturing, when both do the same kind of business. The existing statutes on the subject relating to manufacturing corporations we do not regard as having been passed necessarily in amendment of their charters. They relate to all the corporations described, whether there is any power reserved in the Legislature to amend their charters or not, and they do not purport to have been passed for the purpose of restricting the corporate powers of the corporations. Without attempting to define the limits of the power of the General Court in Massachusetts to control the right of its inhabitants to make contracts generally, we cannot say that a statute requiring manufacturers to pay the wages of their employees weekly is not one which the General Court has the constitutional power to pass, if it deems it expedient to do so. We have not examined in detail the provisions of the bill referred to in the inquiry, or considered whether the bill may not need amendment to make its meaning clear; but the question submitted we think should be answered in the affirmative.

> WALBRIDGE A. FIELD.
> CHARLES ALLEN.
> OLIVER WENDELL HOLMES.
> MARCUS P. KNOWLTON.
> JAMES M. MORTON.
> JOHN LATHROP.
> JAMES M. BARKER.

May 6, 1895.

THE Honorable EBENEZER R. HOAR, a Justice of this Court
from the twelfth day of April, 1859, to the tenth day of March,
1869, died at his residence in Concord on the thirty-first day of
January, 1895. A meeting of the members of the Bar of the
Commonwealth was held in Boston on the ninth day of March,
at which resolutions were passed, which were presented to the
full court on the same day. Before presenting them, the Attor-
ney General addressed the court as follows :

May it please your Honors, — It is a custom of the bar, ven-
erable and befitting, to attest in some solemn manner its appre-
ciation of the worth of its departed leaders, and to pay its tribute
of respect to their memories. Seldom does it happen that this
ceremony is more grateful, or its observance more appropriate,
than upon the occasion which assembles us to-day. Ebenezer
Rockwood Hoar, a member of the bar for fifty-five years, at one
time a justice of this court, died on the thirty-first day of Jan-
uary last at the ripe age of seventy-nine years. A dignified and
impressive presence, long familiar to the courts of this Common-
wealth, is henceforth but an inspiring memory. A place at the
bar is vacant, that will not soon be filled.

He died in Concord, where he was born and had always lived.
That famous town, rich in New England historical associations
no less than in representative New England men, claimed him as
one of her illustrious sons. But no town or county can appro-
priate his fame as a jurist. He belonged to the Commonwealth.
His associates in the county of Suffolk, in the resolutions which
they have instructed me to present, speak, I am sure, not for
themselves alone. The bar of the State shares in the honor
which his career has conferred upon our difficult profession.

It often happens, as we know, that the merits of a lawyer are
justly appreciated only by his associates at the bar. The stan-
dards of the layman are not always accurate. Perhaps the
recognition of this fact may account in part for the origin and
growth of the custom of observances like this. But, be that as it
may, no such necessity constrains us in the present case. It was
one of the fortunate facts of his life that the community came to

know him and to appreciate him as accurately as did his associates at the bar. The reputation of a lawyer is sometimes specious and undeserved. On the other hand, it is not always adequate to his real worth. But Mr. Hoar was one of the few really good lawyers whom everybody knew to be a good lawyer.

Nor are we called upon to pronounce upon his work, that we may seek to preserve his name from the oblivion to which the fleeting memories of great lawyers are proverbially consigned. He has become a part of the imperishable history of the country. This distinction, however, was not achieved at the expense of his professional work. Throughout his life he was loyal to that most jealous and exacting mistress, the law, and served her with the measure of exclusive and singular fidelity which she demands of those who enter her service. The price of such service is often the renunciation of fame ; but it was not so in his case. It is not too much to say that the record of the progress of civilization will be incomplete if it omits honorable mention of the name of Ebenezer Rockwood Hoar.

There are some circumstances of a man's life over which he has no volition, but which go far to mark his career. As to these Mr. Hoar was unusually favored. He was descended from the best and purest of Puritan stock. It was also his fortune to grow up in a community which has twice led the march when the bugle call of freedom sounded, — a community to live in which could have been but an inspiration. He was no less fortunate in the time of his career. Entering upon his work at the period in her history when Massachusetts was just emerging from the provincialism of her Colonial days, when the great inventions of modern times were beginning to revolutionize civilization, called to the bar when Lemuel Shaw was laying broad and deep the foundations of the jurisprudence of Massachusetts, he was brought in touch with all that succession of momentous events which have made the last half-century the golden age of history.

He was called to the bar in 1839. His firm grasp of the law, his strong traits of character, his impartial sense of justice, early marked him as especially adapted to a judicial career. Ten years from the time of his admission he was appointed one of

the judges of the Court of Common Pleas. His love of professional work, however, was still strong; and after a brief time he resigned his office to take his place once more at the bar. But again the Commonwealth required his services, and from 1859 to 1869 he was one of the justices of this court. It is not to be denied that judicial work was to his liking; but it is also true that his love for the contests of the bar always finally predominated, as is shown by the fact, I believe without precedent, that he twice resigned a commission as judge; and at a later period of his life declined the offer of the high position of Chief Justice of Massachusetts.

Of his work here it is simple justice to say that he did his full share in maintaining the commanding place that the Supreme Judicial Court of this Commonwealth has attained and deserves among the tribunals of English speaking people. But he was not destined to end his life upon the bench. That which to most of us is justly regarded as a fitting climax to an honorable and useful life was for him but the beginning of his career. He was called from the bench to participate in the affairs of the nation at that critical and important period when the wreckage and demoralization of the civil war were being cleared away to make room for the greater America in which we now live. In whatever public station to which he was called, he acquitted himself with honor to himself and credit to his Commonwealth. Posterity particularly will remember with gratitude his work as one of the joint high commission which negotiated the Treaty of Washington, — a treaty which in its results was a sure harbinger that in the progress of civilization arbitration is to take the place of war.

That he was not always popular with his associates is to be conceded. He was not pliable. He could not be handled, and he would not be used. He met with reverses in his political career which would have disheartened a man of weaker fibre. But, as we now look at it, he was usually right; and what perhaps is no less satisfactory, his career has demonstrated that reverses are not always disasters, and that the road to the lasting esteem of men is to be found in fearless devotion to convictions, even in spite of apparent defeat.

But this at least may be said, and perhaps it is the most

characteristic thing that can be said of him. Under all circumstances, and above all things else, he was a typical son of Massachusetts. He was bone of her bone and flesh of her flesh. Whatever she has deserved was his rightful inheritance. It is not too much to say that the very elements of character and temperament, (if this expression may be applied to a Commonwealth,) which have given Massachusetts her position in history, were to be found in a marked degree in him. Cultured and refined, yet intensely democratic; fearless, but just; an unforgiving foe of sham, trickery, and injustice; absolutely uncompromising, preferring the call of duty to the approval of men; a sturdy fighter; sometimes hated, but always respected; — if these characteristics describe Massachusetts in her relations to the great family of States, they are no less descriptive of Mr. Hoar.

If such a man occasionally excites enmity, it is not necessarily to his discredit. The world has little use for a man of affairs who is without enemies. But such a man also attracts troops of friends whom he binds to himself with hooks of steel. Especially is this true when it happens, as in the case of Mr. Hoar, that the softening influence of age discovers traits of character which the aggressiveness of manhood had obscured. As, in later years, he laid aside from time to time his armor of battle, we came to know what those who enjoyed his intimacy had always appreciated,— that underneath his rugged exterior was a sweetness of disposition, a rare sense of humor, a bubbling well-spring of human nature, an unostentatious charity, which made him best beloved· by those who knew him best.

I have alluded briefly to the character of his public service. But it is to a still later period of his life that we who were his associates at the bar, as well as your honors, I apprehend, turn after all with the most satisfaction. It was when, putting off the robes of office, he returned again to his place at the bar. For the last twenty years he has stood among us, a conspicuous example of the proposition we maintain, that there is no more honorable or useful position for a lawyer than at the bar. It is as a simple and untitled practitioner, trusted by his clients as few men are, respected by the court as we all might wish we deserved to be, illuminating by the character of his work the

profession of which we are so justly proud, that he will be most loyally and gratefully remembered by his professional associates.

Though we deplore his loss, the sentiment of this occasion is not grief at his death, but rather gratification that he lived. The long day of his life was rounded out, and no clouds obscured the golden sunset. Death in the course of nature comes to all. Sooner or later, though we may know not when, the harvester will claim us for his own. We neither fear nor welcome his coming; but we comfort ourselves with the hope that it will not be so prematurely that the wound of laceration shall bleed; nor yet that we shall be left upon the branch alone, shrivelled and shrunken; but rather, like our honored associate, that we shall drop from the tree of life in the golden autumn, like fruit fully ripened, leaving no scar.

The Attorney General then presented the following resolutions:

Resolved, That, whereas the Honorable EBENEZER ROCKWOOD HOAR, formerly Associate Justice of the Supreme Judicial Court, died at his home in Concord, Massachusetts, on the 31st day of January, in the year 1895, in the seventy-ninth year of his age, this Bar does now put on record the following memorial of its venerable and distinguished brother.

He was admitted to practice fifty-six years ago, and served the law at the bar and on the bench for more than half a century. He was a member of the Court of Common Pleas from 1849 to 1853, and of the Supreme Judicial Court from 1859 to 1869. He was Attorney General of the United States for more than a year in the first term of President Grant, and discharged the duties of that high office with conspicuous ability. In 1871 he rendered the most distinguished public service of his life as a member, and a most influential member, of the commission which settled controversies, new and old, between this country and Great Britain by the Treaty of Washington. In 1872 and 1873 he was a member of the House of Representatives of the United States, and in that office again served the law with great assiduity, ability, and success as a member of the sub-committee of the committee of the House appointed to revise the work of the

revisers of the Public Statutes of the United States. The rest of his active life was spent in the practice of the law.

In all his professional life, whether on the bench or at the bar, he proved himself an able, learned, brave, upright, strong man, — strong in perception and understanding, strong in character, strong in conviction and resolution, strong in an unfailing and unclouded sense of duty.

He was conspicuously marked by that mental intrepidity which comes of clear sight, steady temper, and strenuous purpose, — by that union of dauntless courage and stubborn conscience for which majorities have no terrors.

He was an inveterate hater and indefatigable foe of imposture in all forms and under all conditions.

He was a Massachusetts man to the bone; thoroughly knowing her history and thoroughly comprehending her institutions; punctual in all his duties as one of her citizens; proud of her achievements, devoted to her welfare, her unflinching champion against all comers in all causes.

He loved literature. He read the best and with the best appreciation, and remembered with marvellous tenacity what he read. He was familiar with the choicest English authors, old and new. The English Bible he knew almost by heart. He did not allow his reading in the classics to cease with his college course, but drew from them ever fresh enjoyment to the end of his life.

He loved and practised plainness of speech and dress and deportment, as expressions of that directness which so strongly marked his thought and conduct.

He was the best of company; his talk rich in reminiscences and anecdote and happy quotation, bright with flashes of the keenest wit, and warm with genuine enjoyment of social intercourse.

He was a man of nobility of character, frank in all his dealings, magnanimous, sympathetic, loyal in his friendships, generous, and compassionate. He stood well this supreme test, — his townsmen and neighbors trusted and loved him.

He died full of honors; an American citizen of the truest type, recognized by his fellow citizens on all hands as one of the most worthily distinguished of his country's sons, a bulwark of her good name, and an ornament of her history.

Chief Justice Field responded as follows :

Brethren of the Bar, — The court receives the resolutions of the bar concerning Judge Hoar with the same appreciation of his character and of his professional and public life as the bar have expressed. In his death we have lost not only a very distinguished lawyer, but a man of unique character, who has had great influence upon the whole people of the Commonwealth. It is now twenty-six years since he resigned the office of Associate Justice of this court, and all who were then the justices, except one, are dead. A majority of the present members of the bar probably never tried cases before him as judge, and they knew him best as a lawyer actually engaged in practice. He was born in 1816, graduated from Harvard College in 1835, and was admitted to the bar in 1839. As early as 1846 he was a member of the State Senate, and in 1849 he was appointed a justice of the Court of Common Pleas. While a comparatively young man, his commanding abilities and his fitness for his profession and for public affairs were recognized. From the first he was a man of marked characteristics and decided opinions, and he displayed throughout his life a constant sense of public and private duty.

His term of service on this court was not quite ten years long. When he came upon the court, the political agitations concerning the extension of slavery were fast tending toward war; and when he left the bench, the Rebellion had been successfully put down and slavery abolished, and he resigned to take part in the peaceful settlement of the many difficult questions which arose from the war. When appointed to the court, he had attained such distinction as to be reckoned among the leaders of the bar, and he added greatly to his reputation while on the bench. He was pre-eminent for his love of justice, the quickness and keenness of his perceptions, his extraordinary power of analysis, his sound and strong judgment, his absolute moral courage, and a style so clear and exact that his meaning could not be mistaken. He was very rapid in the performance of work, and perhaps sometimes showed the impatience natural to very quick minds at any delay or indirection in the conduct of a cause, and he always had a deep-seated dislike for sophistries of all sorts. The incisiveness of his language was apt to go to the very marrow of any con-

troversy, and no jury ever left their seats where he presided without having plainly and forcibly presented to them the exact issues to be determined. In the administration of the office of Attorney General of the United States, he took exclusive charge of the political business of the office, and he had to deal with many matters of grave importance. Our relations with Great Britain, especially, were in an unsatisfactory condition, and although the burden of the negotiations belonged, under the President, to the Secretary of State, yet Judge Hoar strongly supported the Secretary. It was in consequence of this as well as of the confidence which the President had in his character, ability, and good judgment, that he was appointed one of the commissioners to negotiate the Treaty of Washington.

Matters of domestic as well as of foreign policy were often made cabinet questions while he was Attorney General, and his opinions were always unequivocal. During his term of office nine judges of the Circuit Court and two justices of the Supreme Court of the United States were appointed, and he personally argued the important cases before that court in which the United States were concerned. The thorough, able, and sagacious manner in which he met all the responsibilities of his office was acknowledged by all.

After he returned to Massachusetts, in 1870, he was known as a lawyer and a public-spirited citizen, interested in everything that concerned the welfare of the Commonwealth. He occasionally tried cases before a jury, but most of his practice was before the court. He either lacked or disdained the art of influencing men by flattery, and he was perhaps of too unaccommodating a temperament to humor any man's prejudices. His arguments were like his opinions, — not long, very clear, remarkably strong in analysis, and persuasive in their sound sense. He used great directness and simplicity of statement, and he relied on his wit to point or enliven the argument. Although he always took an active interest in politics, the only elective political offices he ever held were those of Senator in the State Senate for one term, of Representative in Congress for one term, and of Presidential Elector.

But he was interested not only in law and politics; he was interested in everything human, and was especially devoted to

the welfare of his college and his church. I think he must be regarded, on the whole, as a conservative man in his general character; and he was especially anxious to preserve the best institutions and the best habits of New England life, and to make the most of them.

He had all the law practice he wanted; it was of the best kind, and took as much of his time as he wished to give to his profession. He would not, I think, have enjoyed an overwhelmingly large practice, for he wished time for conference with his friends, for meditating upon many things, for enjoying many things, and for reading what he chose. He was famous for his wit, and sayings of his will be quoted for generations. He was emphatically a New Englander, and his whole conversation and manner showed the soil from which he sprang. He had the shrewd judgment of the typical New Englander, and the faculty of characterizing a man or a cause by an epithet or a phrase in a strictly Yankee way. It was the nimbleness of his wit and the singular charm of his conversation, as well as the sincerity of his character, which endeared him so much to that bright set of literary men whose companion he was. In a running conversation his wit appeared constantly. It was unpremeditated, sudden, and every way his own. He kept no memoranda of fine sayings, but he had a remarkable memory for anything striking or felicitous in speech which he had ever heard or read, and he had read much of the best English literature. He was an unflinching advocate of any cause which he had much at heart, and he could hardly forgive any persons who he thought deliberately acted in violation of their own sense of right. He grew more tolerant as he grew older; but he still always preserved fidelity to his convictions, cost what it might. It was only on acquaintance that one could know how tender-hearted he was, how generous he was, how considerate he was, to those whom he thought deserving. He had the habit of repressing any strong exhibition of feeling, and he took great satisfaction in doing good by stealth. He was a delightful companion to those who knew him well, and his personality was so distinct and pronounced that no one can be found to take exactly his place in our profession. He has left behind him an example of disinterestedness, sincerity, courage, noble-

ness of purpose, and strenuous endeavor to make the world better worth living in, which it is easy to praise, but not easy to imitate.

The resolutions with a memorandum of these proceedings will be entered on the records of the court.

The court then adjourned.