ARTHUR N. HOLCOMBE & another *vs.* WILLIAM P. CREAMER
& others.

Suffolk.    December 7, 1917. — September 18, 1918.

Present: RUGG, C. J., CROSBY, PIERCE, & CARROLL, JJ.

*Minimum Wage Commission.    Constitutional Law.    Words,* "Decree."

The provisions of the statute creating the minimum wage commission, contained
in St. 1912, c. 706, as amended, which are not mandatory as to rates of wages,
contain no words of compulsion either upon employer or employee and do not
restrain freedom of action by either employer or employee as to the wages to
be paid or received, are not in violation of any of the articles of the Declara-
tion of Rights nor in violation of the Fourteenth Amendment to the Constitu-
tion of the United States.

The provisions of the statute creating the minimum wage commission in no way
exceed the limits of the right of the public to inquire into private affairs.

Nor are the provisions of that statute open to objection as an unconstitutional
delegation of legislative power.

The facts which the minimum wage commission is authorized to ascertain and the
evidence which it is empowered to seek from employers cannot form the basis
of a criminal proceeding, because no crime is created and no prosecution is pro-
vided for.

It here was unnecessary to consider the provisions relating to newspapers con-
tained in St. 1912, c. 706, §§ 15, 16, of the statute creating the minimum wage
commission, because those provisions were not before the court, but it was
*pointed out,* that, even if those provisions should be found to transcend in any
way the power of the Legislature under the Constitution, they are quite
separable from the rest of the statute.

It also was *said* that the grounds on which the decision was based made it wholly
unnecessary to consider the question, whether a mandatory minimum wage

law would violate the provisions of our Constitution or the rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

PETITION, filed in the Supreme Judicial Court on January 7, 1916, by the members of the minimum wage commission established under St. 1912, c. 706, amended by St. 1913, cc. 330, 673, and St. 1914, c. 368, for an order of the court compelling certain witnesses to testify before the commission.

The case was heard by *Braley*, J., who found that the facts as proved or admitted were as stated in the findings of fact annexed to his report. The counsel for the respondents asked "that the right to try out the question of the regularity of the proceedings precedent to the establishment of the laundry wage decree by the minimum wage commission be reserved without prejudice for determination in any other proceeding." The single justice granted this request. The counsel for the respondents then asked the single justice to rule that the minimum wage commission statutes, St. 1912, c. 706, and acts in amendment thereof, were unconstitutional. The justice refused so to rule, and ordered process to issue as prayed for. At the request of the respondents he reported all questions of law involved for determination by the full court.

*E. M. Sullivan*, for the respondents.

*A. D. Hill*, (*J. G. Palfrey* & *H. W. Brown* with him,) for the petitioners.

RUGG, C. J. The question presented by this record is the constitutionality of St. 1912, c. 706, as amended by St. 1913, cc. 330, and 673, and St. 1914, c. 368, establishing the minimum wage commission. Sections 1 and 2 of the act regulate the appointment, compensation, clerical assistance and office accommodations of the commission. Section 3 states its duty to be "to inquire into the wages paid to the female employees in any occupation in the Commonwealth, if the commission has reason to believe that the wages paid to a substantial number of such employees are inadequate to supply the necessary cost of living and to maintain the worker in health." Section 4 authorizes the commission, when of opinion after investigation that the wages of a substantial number of women in any occupation are thus inadequate, to form a wage board composed of an equal number of representatives of the employers and of the employees in the specified industry and of one or more representatives of the public, not exceeding one half the

number of the representatives of either of the other parties. Section 5 empowers the commission to send to such wage board all pertinent information in its possession relative to the wages in the occupation in question, and requires that the wage board, after taking into consideration "the needs of the employees, the financial condition of the occupation and the probable effect thereon of any increase in the minimum wages paid, and shall endeavor to determine the minimum wage, whether by time rate or piece rate, suitable for a female employee of ordinary ability in the occupation in question, or for any or all of the branches thereof, and also suitable minimum wages for learners and apprentices and for minors below the age of eighteen years. When two thirds of the members of a wage board shall agree upon minimum wage determinations, they shall report such determinations to the commission, together with the reasons therefor and the facts relating thereto, and also the names, so far as they can be ascertained by the board, of employers who pay less than the minimum wage so determined." Section 6 directs the commission to review each report made by a wage board, empowering it to approve or to disapprove any or all of its determinations, or to recommit the subject to the same or a new wage board. If the commission approves any or all of the determinations of the wage board it shall then, after seasonable notice, give a public hearing to all employers paying less than the minimum wage thus tentatively approved. If, after such public hearing, "the commission finally approves the determination, it shall enter a decree of its findings and note thereon the names of employers, so far as they may be known to the commission, who fail or refuse to accept such minimum wage and to agree to abide by it." The commission shall publish a summary of its findings and its recommendations and the facts as it finds them to be as to the acceptance of its recommendations by employers in the given industry, together with the names of those adopting or refusing to follow such recommendations. By § 14 the commission is vested with power to reinvestigate these facts from time to time thereafter and to publish the names of employers failing to observe its recommendations. Any employer, who files a declaration under oath to the effect that compliance with the recommendations of the commission would render it impossible for him to conduct his

business at a reasonable profit, shall be entitled to a review of such recommendations by the Supreme Judicial Court or the Superior Court according to equity procedure. If the court finds that the averments of the declaration are sustained, it may restrain the publication of the complainant's name, but not otherwise affect the determination of the commission. Section 8 provides for reinvestigation after a minimum wage has been established, with the same procedure as in an original inquiry. Section 9 authorizes the commission to issue special certificates for employment in certain instances to women physically defective. Section 10 confers upon the commission similar powers respecting wages paid to minors in any occupation in which the majority of employees are minors. Section 11 enjoins employers to keep registers of the names, addresses, occupation and weekly wages of women and minor employees and to submit them to the commission or director of the bureau of statistics on request. Section 12 relates to the gathering of statistics. Section 13 prohibits employers from discrimination against employees because of testifying or serving on a wage board or giving information concerning conditions of employment. Section 15 imposes a penalty upon "any newspaper refusing or neglecting to publish the findings, decrees or notices of the commission at its regular rates for the space taken," and § 16 exonerates the members of the commission and publishers of newspapers from actions for damages for publishing the names of employers in accordance with the act "unless such publication contains some wilful misrepresentation."

The facts in the case at bar are that proceedings were had in accordance with the terms of the act respecting wages paid female employees in laundries. A determination finally was made by the commission fixing a minimum weekly wage schedule varying according to experience in the work from $6 to $8. No review of this determination appears to have been sought in the courts. Publication thereof was made as provided in the act. Thereafter the commission proceeded to investigate wages actually paid to such employees in order to ascertain what employers were complying with its recommendations. The respondents, who are owners or officers of corporate owners of laundries, refused to furnish the required information. This proceeding is brought to compel them to do so.

It is manifest from the summary of its various provisions that the act is not mandatory as to rates of wages. It contains no words of compulsion upon either employer or employee. It does not restrain freedom of action by either employer or employee as to the wages to be paid or received. Any woman and her employer may make and enforce any agreement respecting compensation for her labor unhampered by any provision of the act. There is no constraint affecting property or conduct. The act does not purport to exercise any check with respect to liberty of contract, use of property, or management of business. The act does not require payment to any woman or minor of more than fair compensation, however small it may be. It does not prevent one or any number of women, who do not desire for any reason to earn their entire support by labor, from working for less wages than recommended by the commission. It does not prohibit any employer from contracting for the services of such women for any compensation mutually agreed upon. There may be divers reasons why such contracts may be wanted by working women, such as physical or mental weakness and consequent inability to earn the full wage, reliance upon other sources of income or support, and desire to work for short time in order that remaining hours may be devoted to study or other activities. These considerations are left to operate to their full extent without hindrance from the statute. The chief purpose of the act as gathered from its words is that there shall be an investigation as to facts, a statement of the conclusions drawn from those facts and a making public of those conclusions, all by or under the supervision of an administrative board. The utmost bound of the authority of the commission is to make recommendations. It cannot issue any order. Although in several places in the act occur the words "decree," "decrees" and "decree of its findings," it is manifest that they signify only advisory suggestions and not authoritative directions. "Decree" is not used in its judicial sense in the statute. It is the equivalent of a counsel succinctly stated. This is true also of the words "obeying its decrees" in § 14, where it is plain from the context that they mean only following its recommendations. In its strictly legal signification a decree is the formal expression of a final decision, which can be issued only by a court clothed with jurisdiction to compel obedience to that decision by

invoking the power of the State to that end, so far as necessary. The whole act shows that "decree" used in this statute was not intended to have any such meaning.

Doubtless one aim of the act is to bring to bear the force of public opinion in support of the acceptance of the recommendations of the commission. This may be a kind of coercion. But it can go no further than ascertained and published facts induce members of the public as individuals to the action of giving or withholding custom or patronage. The public money could not be expended for the support of the commission unless its functions related to a public as distinguished from a private matter. It hardly can be pronounced a matter utterly devoid of common interest to ascertain whether and to what extent substantial numbers of working women are receiving wages "inadequate to supply the necessary cost of living and to maintain the worker in health." Restraint upon freedom of contract by women and children has been recognized as an appropriate exercise of the police power in numerous cases. See, for example, *Berdos* v. *Tremont & Suffolk Mills*, 209 Mass. 489; *Commonwealth* v. *Riley*, 210 Mass. 387; *Desmond* v. *Young*, 173 Mass. 90. The kind of constraint, which may arise from making public facts and conclusions at the expense of the Commonwealth, would involve other considerations if directed to affairs in which there could be no legitimate general interest directed to the rational promotion of the public health, order, morals and in a restricted sense the common welfare.

Merely for the purpose of illustrating the extent of the public interest in matters involving primarily and chiefly private concerns, numerous decisions are pertinent.

Interference with liberty of contract by employer and employee to the extent of requiring weekly payments of wages, *Opinion of the Justices*, 163 Mass. 589, and of limiting the hours of labor of women and minors, *Commonwealth* v. *Hamilton Manuf. Co.* 120 Mass. 383, *Commonwealth* v. *Riley*, 210 Mass. 387, *Commonwealth* v. *John T. Connor Co.* 222 Mass. 299, has been sustained. Freedom of contract as to small loans has been seriously curtailed by statutes which have withstood attacks upon their constitutionality. In *Commonwealth* v. *Danziger*, 176 Mass. 290, the requirement of a license for those making such loans was sus-

tained. The rate of interest to be charged may be limited, *Dewey* v. *Richardson,* 206 Mass. 430. Statutes circumscribing the freedom of contract by wage earners in assigning pay to be earned in the future, to the extent of restricting the time during which such assignments may run, *McCallum* v. *Simplex Electrical Co.* 197 Mass. 388, and requiring acceptance of assignment by employer and assent by the wife of employee, *Mutual Loan Co.* v. *Martell,* 200 Mass. 482, affirmed in 222 U. S. 225, have been upheld. Usury laws have been recognized as valid, usually without discussion as to constitutionality, although an invasion of freedom of contract. Numerous of our own decisions proceed upon that footing. See also *Griffith* v. *Connecticut,* 218 U. S. 563. It was decided in *John P. Squire & Co.* v. *Tellier,* 185 Mass. 18, that St. 1903, c. 415, which provided that sales of merchandise in bulk, not in the ordinary course of trade, should be void against the creditors of the seller unless made after compliance with certain requirements for the information and protection of creditors, was not an unconstitutional interference with liberty of contract. To the same effect see *Lemieux* v. *Young,* 211 U. S. 489. The opinion has been expressed that contracts for prices discriminating between different parts of the Commonwealth, for the purpose of destroying competition, may be prohibited. *Opinion of the Justices,* 211 Mass. 620. A decision to the same point is *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157. The prohibition of the sale of goods without license from stores temporarily leased was upheld in *Commonwealth* v. *Crowell,* 156 Mass. 215. R. L. c. 65, § 1. In *Commonwealth* v. *Strauss,* 191 Mass. 545, a statute making it a criminal offence to require as a condition in the sale of goods that the purchaser should not sell or deal in the goods of any other person than the seller was sustained. Scarcely any form of contract is more common than that of insurance. Yet a large variety of statutes interfering with freedom of contract upon that subject have been supported. For example, the form of the contract may be prescribed by the Legislature, *Considine* v. *Metropolitan Life Ins. Co.* 165 Mass. 462, 466, or determined in the first instance by an administrative officer, *New York Life Ins. Co.* v. *Hardison,* 199 Mass. 190, 198, and cases there collected; parties may be forbidden to agree that misrepresentations in the negotiations for insurance made without intent to deceive and not

increasing the risk of loss, shall avoid the policy, *Nugent* v. *Green-field Life Association,* 172 Mass. 278; and parties may be prohibited in casualty insurance from contracting that the insured must pay his loss before being permitted to recover from the insurer, *Lorando* v. *Gethro,* 228 Mass. 181.

The Supreme Court of the United States has upheld statutes requiring employers who pay wages in scrip, store orders, or other evidences of indebtedness, to redeem them in cash, *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, *Keokee Consolidated Coke Co.* v. *Taylor,* 234 U. S. 224, forbidding persons to deal in stocks on margin, *Otis* v. *Parker,* 187 U. S. 606, proscribing a fee in excess of $10 to any person for preparing and prosecuting a pension claim, *Frisbie* v. *United States,* 157 U. S. 160, 165, prohibiting contracts to pay wages less often than twice each month, *Erie Railroad* v. *Williams,* 233 U. S. 685, making illegal the sale of lard in bulk in small quantities or except in containers holding designated weights, *Armour & Co.* v. *North Dakota,* 240 U. S. 510, inhibiting the sale of loaves of bread of other than standard weights fixed by the statute, *Schmidinger* v. *Chicago,* 226 U. S. 578, see *Commonwealth* v. *McArthur,* 152 Mass. 522, prohibiting washing and ironing in public laundries between specified hours, *Barbier* v. *Connolly,* 113 U. S. 27, requiring wages earned but not due to be paid immediately upon discharge, with or without cause, of any servant or employee, regardless of contract respecting the subject, *St. Louis, Iron Mountain & St. Paul Railway* v. *Paul,* 173 U. S. 404, changing the rules of the common law as to fellow servants, assumption of risk, contributory negligence and recovery for death caused by negligence, and prohibiting contracts to avoid the effect of that change, *Second Employers' Liability Cases,* 223 U. S. 1, 49–52, *Philadelphia, Baltimore & Washington Railroad* v. *Schubert,* 224 U. S. 603, and forbidding the manufacture of oleomargarine, *Hammond Packing Co.* v. *Montana,* 233 U. S. 331. Taxation to the extent of prohibition of contracts as to trading stamps has been upheld. *Rast* v. *Van Deman & Lewis,* 240 U. S. 342, 368. A statute making it unlawful to pay miners employed at quantity rates upon the basis of screened coal instead of its weight as originally mined in mines where ten or more men were employed underground, has been decided not to violate the Fourteenth

Amendment to the Federal Constitution. *McLean* v. *Arkansas,* 211 U. S. 539. An act of Congress prohibiting the payment in advance of seamen's wages to be earned in interstate or foreign commerce does not violate constitutional freedom of contract. *Patterson* v. *Bark Eudora,* 190 U. S. 169. The validity of legislation penalizing the sale of cigarettes without license, *Gundling* v. *Chicago,* 177 U. S. 183, prohibiting contracts for options to sell or buy grain or other commodity at a future time, *Booth* v. *Illinois,* 184 U. S. 425, barring the employment of women more than a limited number of hours per day or week in manufacturing or mechanical establishments, *Riley* v. *Massachusetts,* 232 U. S. 671, *Miller* v. *Wilson,* 236 U. S. 373, forbidding contracts between employer and employee limiting the right of the latter to recover damages at common law, *Chicago, Burlington & Quincy Railroad* v. *McGuire,* 219 U. S. 549, and prescribing the particular method of compensation to be paid by employers to miners for the production of coal, *Rail & River Coal Co.* v. *Ohio Industrial Commission,* 236 U. S. 338, 349, has been sustained against attacks founded on interference with the freedom of contract secured by the Fourteenth Amendment to the United States Constitution. A statute imposing an absolute duty upon the owner to provide safeguards for machinery in manufacturing establishments has been held to prohibit a contract against liability arising from a failure to comply with the statute even with one expressly employed to furnish and install such safeguards. *Bowersock* v. *Smith,* 243 U. S. 29. In most if not all of these cases it also was held that the statutes did not deprive anybody of property without due process of law, or of the equal protection of the law.

Reference is made to these authorities solely to indicate the range of the public interest respecting matters of private relations, and not to intimate whether they afford any foundation for a compulsory minimum wage law. These decisions rest at bottom on the proposition that the public welfare in respect to health, morals and safety bears so close a relation to the subjects dealt with in the several statutes as to justify legislative regulation.

The present act may have had its origin in the belief that women and minors in some branches of industry, under the constraint of necessity to earn their living, were working for wages less

than enough to provide them support in healthful surroundings as to food, clothing and home and under conditions suitable for the normal activity of the moral faculty. In its broad aspects this general subject is one having some relation to the welfare of the community. The ascertainment of the facts respecting this subject at a given time and the making of recommendations for the remedy of evil conditions, if found to exist, by a temporary commission acting under the sanction of public authority, would be a lawful expenditure of public moneys. It does not seem to us unreasonable to contend that wages insufficient for the bare essentials of the cost of support and the nourishment of the health of women laborers have such relation to the public morals, good order and health that the dissemination of information upon the subject of such wages from time to time by a permanent commission is within the power of a Legislature clothed, as is our General Court, with full power and authority to make "all manner of wholesome and reasonable" statutes not repugnant to the Constitution. The circumstance that the commission further is directed to make recommendations as to wages to be paid, does not add an element of compulsion in law in connection with all the other factors. The recommendation in the nature of things must correspond more or less closely to the facts found. The members of the public are free to decide from the facts stated and their own experience whether the conclusions of the commission are just and wise or oppressive and vain, and to act according to their own conceptions of their private advantage and the public welfare. It is not for us to pass upon the question whether such legislation is wise. Unless it can be said to bear no relation whatever to legitimate public interests or to be a palpable invasion of private right, liberty and property without constitutional warrant, the decision of the General Court as embodied in the statute must stand.

The natural and inalienable rights are secured to each member of society by arts. 1, 10 and 12 of the Declaration of Rights of our Constitution to enjoy liberty, to acquire, possess and defend property and to seek and obtain safety and happiness, and to be protected by law in the exercise of these rights. Freedom of contract in a broad sense is a constitutional right. "Liberty" as used in the Fourteenth Amendment to the Constitution of the

United States, said Mr. Justice Harlan, "embraces the right to be free in the enjoyment of one's faculties; 'to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts that may be proper.' *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589." *Lottery Case,* 188 U. S. 321, 357. *Booth* v. *Illinois,* 184 U. S. 425, 428, 429. *Adair* v. *United States,* 208 U. S. 161, 173. *Coppage* v. *Kansas,* 236 U. S. 1, 14. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 251. "Liberty" wherever it occurs in the Declaration of Rights of the Constitution of this Commonwealth has at least as comprehensive a meaning. *Wyeth* v. *Cambridge Board of Health,* 200 Mass. 474, 478. *O'Keeffe* v. *Somerville,* 190 Mass. 110. *Gleason* v. *McKay,* 134 Mass. 419. *Opinion of the Justices,* 208 Mass. 619, 622. *Bogni* v. *Perotti,* 224 Mass. 152. But these guarantees are subject to the police power. Without undertaking to define that power, it comprehends rational action by the legislative department for the protection of the public health, morals and good order. These guarantees do not go to the extent of protection against publicity respecting contracts with women and minors, which the consensus of opinion of the Commonwealth, as formulated in a statute requiring impartial investigation by a public board, declares wanting in affording to them necessary support. Assuming that these and other constitutional safeguards protect the individual in the enjoyment of privacy, they do not afford immunity against police regulations requiring knowledge touching subjects which may within reason be thought to promote the health, safety and morals of the community.

There are limits to the right of the public to inquire into private affairs. The coercion resulting from legislation, in form not compulsory, may in practice be so severe as to leave no alternative save compliance. In such a case its validity would depend not upon its form but its substance. But it is not necessary to discuss limitations of this character, for the reason that the present statute does not according to its terms reach into that realm. There is nothing in the record to warrant the inference that such is its actual effect. The inducements held out by this act to employers to accept the recommendations of the commission in principle do not go beyond those of the workmen's com-

pensation act, which abolished the defences of assumption of risk, contributory negligence, and the fellow servant doctrine as to employers who do not become subscribers, but left those rules of law in force without the benefit of the employers' liability act as to employees who elect to rely upon their common law rights. Yet that act has been held valid as not depriving the employer or employee of property without due process of law, limiting unduly freedom of contract, or interfering with other constitutional rights. *Young* v. *Duncan*, 218 Mass. 346. *Opinion of the Justices*, 209 Mass. 607.

As has been pointed out, the present statute does not impair liberty of contract. Absolute freedom to make any contract respecting wages is left untouched. Notwithstanding its terms, still "An employer has a right to engage all persons who are willing to work for him, at such prices as may be mutually agreed upon; and persons employed or seeking employment have a corresponding right to enter into or remain in the employment of any person or corporation willing to employ them." *Vegelahn* v. *Guntner*, 167 Mass. 92, 97. The right of every man is undisturbed "to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can." *Carew* v. *Rutherford*, 106 Mass. 1, 14. *Opinion of the Justices*, 163 Mass. 589, 595. *Commonwealth* v. *Perry*, 155 Mass. 117.

There is no undue invasion of the right of privacy assuming that that is an element of the constitutional right to seek and obtain "safety and happiness."

The principles on which the boycott and blacklist are held unlawful, as set forth in *Pickett* v. *Walsh*, 192 Mass. 572, *Burnham* v. *Dowd*, 217 Mass. 351, *Cornellier* v. *Haverhill Shoe Manufacturers' Association*, 221 Mass. 554, and other decisions, have no application to the official publications authorized by this statute.

The statute does not take property of the employer for the reasons already stated.

Since the statute is not compulsory either in form or effect, there is no ground for holding that it is invalid because not affording equal protection of the laws. Whatever might be said about certain provisions of the act in this regard, if it were mandatory, there is no occasion now to discuss that matter. The principles

declared in *Opinion of the Justices,* 220 Mass. 627, 631, *Cotting* v. *Kansas City Stock Yards Co.* 183 U. S. 79, 111, and *Barrett* v. *Indiana,* 229 U. S. 26, 30, are not applicable.

The analysis of the act already made demonstrates that it is not open to objection as an unconstitutional delegation of legislative power. In this respect the statute is well within the authority of numerous decisions. *Brodbine* v. *Revere,* 182 Mass. 598. *Commonwealth* v. *Kingsbury,* 199 Mass. 542. *Commonwealth* v. *Sisson,* 189 Mass. 247. *Commonwealth* v. *Hyde,* 230 Mass. 6. *Boston, petitioner,* 221 Mass. 468. It is plain also that it does not confer judicial powers upon the commission. *Nelson* v. *State Board of Health,* 186 Mass. 330. *Dinan* v. *Swig,* 223 Mass. 516, 520. It follows that the statute does not violate art. 30 of the Declaration of Rights. *Boston* v. *Chelsea,* 212 Mass. 127.

There is no criminal element about the act so far as it concerns the employer. The facts which the commission is authorized to ascertain and the evidence which it is empowered to seek from employers cannot form the basis of a criminal proceeding, because no crime is created and no prosecution is provided for. Revealing the information or answering the questions required by the statute cannot subject the employer to penalty or forfeiture, and does not expose him to imputation of crime. Therefore the constitutional prohibition against a subject being "compelled to accuse, or furnish evidence against himself" is not violated. Art. 12 of the Declaration of Rights. *Commonwealth* v. *Willard,* 22 Pick. 476, 477. It follows that there is no foundation for the contention of the respondents that they are subjected to punishment without proper notice, or complaint, or hearing, or trial by jury.

It is not necessary to consider the scope and validity of § 15 of St. 1912, c. 706, which purports to compel newspapers to publish notices and findings of the commission at its regular rates for space, and of § 16, which purports to exonerate the commission and publishers and proprietors of newspapers from liability for damages for such publication, except for wilful misrepresentation. Those sections are not involved on this record and are left entirely open for future consideration. Even if they should be found to transcend in any respect the power of the

Legislature under the Constitution, they are quite separable from the rest of the act. It cannot be thought that the rest of the statute would not have been enacted without them, and therefore the constitutionality of the sections here assailed would not be affected. *Ashley* v. *Three Justices of the Superior Court*, 228 Mass. 63, 81, and cases there collected. *Brazee* v. *Michigan*, 241 U. S. 340.

The act as it has been interpreted does not seem to us to violate any provision of the Fourteenth Amendment to the United States Constitution. The reasons upon which this decision rests, as already stated, appear to us to make this conclusion clear. Holding ourselves strictly bound by the decisions of the United States Supreme Court upon which the respondents rely, such as *Coppage* v. *Kansas*, 236 U. S. 1, 17, 18, *Adair* v. *United States*, 208 U. S. 161, *Smith* v. *Texas*, 233 U. S. 630, *Lochner* v. *New York*, 198 U. S. 45, (see *Bunting* v. *Oregon*, 243 U. S. 426,) *Japanese Immigrant Case*, 189 U. S. 86, 100, *Loewe* v. *Lawlor*, 208 U. S. 274, *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418, 437, 438, 439, *Hawkins* v. *Bleakly*, 243 U. S. 210, *Cummings* v. *Missouri*, 4 Wall. 277, 320, 327, *Louisville & Nashville Railroad* v. *Garrett*, 231 U. S. 298, 307, and *Yick Wo* v. *Hopkins*, 118 U. S. 356, none of them in our opinion are at variance with the result here reached.

The grounds upon which this decision is put make wholly unnecessary consideration of the question whether a mandatory minimum wage law would violate the provisions of our Constitution. They also render superfluous a prophecy whether such an act will be held by the United States Supreme Court to be contrary to the rights and liberties guaranteed by the Fourteenth Amendment to the United States Constitution. See, in this connection, *Stettler* v. *O'Hara*, 69 Ore. 519, affirmed by an equally divided court, Mr. Justice Brandeis taking no part in the consideration and decision, in *Stettler* v. *O'Hara*, 243 U. S. 629, *State* v. *Crowe*, 130 Ark. 272, *Williams* v. *Evans*, 139 Minn. 32, and *Larsen* v. *Rice*, 171 Pac. Rep. 1037.

*Writ to issue.*