Winslow, J.
Rainbow International Marriage Service (“Rainbow”), a Massachusetts company with a branch office at the Friendship Hotel in Beijing, China brought an action in contract against the defendant Ping Cui (“Ms. Cui”) for failing to pay $7,500.00 plus interest and costs of collection as a result of her marriage to a man to whom she had been introduced by Rainbow Relying on a statement of agreed facts filed by the parties, the trial judge entered summary judgment in favor of Rainbow. We reverse.
The undisputed facts are as follows: On May 20,1995, in Beijing, Ms. Cui signed English and Chinese language versions of a contract that had been prepared by *35 Rainbow.[3] Rainbow agreed to perform the following services: to provide an international matchmaking service; to introduce suitable prospective marriage partners on a continuing basis until such time as the client is married; to consult with the client free of charge regarding the matchmaking service and introductions, with a $50 hourly fee for telephone or office consultations; and to arrange for translation of letters from Chinese into English. Ms. Cui agreed to provide suitable photographs as requested by Rainbow for introductions; to allow Rainbow to edit her letters for clarify and qualify and to review any photographs used in correspondence with any person introduced by Rainbow; to respond within a reasonable time to any other client introduced by Rainbow; and to provide copies of marriage photographs for Rainbow’s company records. Any failure by Ms. Cui to provide a suitable photograph, allow editing of her letters, or promptly to respond to any suitors arranged by Rainbow would void the agreement The agreement provided that “no guarantee is made as to when a successful match/marriage will be made.” Ms. Cui paid a $700.00 non-refundable registration fee. In addition to the registration fee, the agreement between the parties further provided that Ms. Cui
agrees to pay Rainbow US $7,500 (Seven Thousand Five Hundred US Dollars) following his/her marriage with a person introduced by Rainbow, that if such payment is not made within 60 days following such marriage there shall be an annual interest rate of 18% paid by the client on all payments overdue, that all costs of collection of such payment shall be assumed by the client...
Ms. Cui’s photograph and biographical information were added to Rainbow’s internet website following execution of the agreement. On November 28, 1997, John Choma of Dorchester contacted Rainbow’s website by email and expressed interest in Ms. Cui. On December 13, 1997, Rainbow provided Ms. Cui with Mr. Choma’s name, address and other biographical information. Once Ms. Cui became aware of Mr. Choma’s existence through Rainbow, Ms. Cui had no further dealings directly with Rainbow other than a letter dated May 18,1998 requesting to terminate the agreement. In April 1998, Mr. Choma contacted Rainbow to request information regarding marriage registration procedures and Rainbow provided the requested information. Rainbow did not verify any of Mr. Choma’s biographical information or investigate his background or suitability to marry Ms. Cui. Rainbow did not receive or revise any correspondence exchanged between Ms. Cui and Mr. Choma. On April 24,1999, Ms. Cui and Mr. Choma were married in Attleboro, Massachusetts and Rainbow commenced this action to recover the $7,500 fee described in the agreement
“The sanctify of the marriage relationship has historically been at the foundation of the welfare of the state, and the law has therefore looked with jealous regard at bargains concerning that relationship.” WILLISTON, ON CONTRACTS, §16:17, p. 429. “The Legislature has declared that ‘the policy of this commonwealth [is] to direct its efforts ... to the strengthening and encouragement of family life.’ G.Lc. 119, §1 (1984 ed.) ... Given this broad concern with the institution of marriage, the State has a legitimate interest in prohibiting conduct which may threaten that institution.” Capazzoli v. Holzwasser, 201 Mass. 158, 160-161 (1986). *36 Massachusetts courts long have recognized that “marriage is a social institution, or status, in which, because the foundations of the family and the domestic relations rest upon it, the commonwealth has a deep interest to see that its integrity is not put in jeopardy, but maintained.” Coe v. Hill, 201 Mass. 15, 21 (1909); Green v. Richmond, 369 Mass. 47, 51 (1975) (“Massachusetts has a strong public interest in ensuring that its rules governing marriage are not subverted”).
Marriage brokerage contracts sometimes are defined as “agreements by which a person is to benefit from consent to or promotion of a marriage between two other persons.” 52 Am.Jur.2d Marriage §120, p. 824 (1970). Cf. White v. Equitable Nuptial Benefit Union, 76 Ala. 251 (1884) (“[a] marriage brokerage contract is an agreement for the payment of money, or other compensation, for the procurement of a marriage.”). Rainbow’s agreement with Ms. Cui extended far beyond the scope of a simple introduction or dating service. True to the company name “Rainbow International Marriage Service Company” the arrangement between Rainbow and Ms. Cui was a marriage brokerage contract as a matter of law. While both parties note that no Massachusetts court explicitly has held that marriage brokerage contracts are void as violative of public policy, the Supreme Judicial Court has presumed that such contracts indeed are void. In Boynton v. Hubbard, 7 Mass. 112 (1810), which involved a wager upon the defendants surviving either of his relatives, the Court observed that
marriage brokerage bonds, which are not fraudulent on either party, are yet void, because they are a fraud on third persons, and are a public mischief, as they have a tendency to cause matrimony to be contracted on mistaken principles, and without the advice of friends; and they are relieved against as a general mischief, for the sake of the public.
Id. at 118. Similarly, in Fuller v. Dame, 18 Mass. 472 (1836), arising from the sale of land, the Court noted in dictum that
[t]he law goes further than merely to annul contracts, where the obvious and avowed purpose is to do or cause the doing of unlawful acts; it avoids contracts and promises made with a view to place one under wrong influences... A man might entertain a very sincere opinion, that a marriage between a certain gentleman of his acquaintance, and a lady of considerable fortune, would be highly beneficial and contribute to the happiness of both parties, and he might lawfully propose this to one or both. But any promise of reward made to him to induce him to do this, or any promise made afterwards in consideration of such services, would be void.
Id. at 481-482. And see Opinion of the Justices, 163 Mass. 589, 592-593 (1895) (“[t]here never has been at any time in Massachusetts an absolute right in its inhabitants to make all such contracts as they pleased... Marriage brokerage and post obit bonds and covenants in restraint of trade sometimes have been held void.”). The dearth of more recent Massachusetts case decisions does not support a conclusion that marriage brokerage agreements somehow have gained legal cachet in the intervening years. Instead, as the Supreme Court of California observed, “[t]he rule that a marriage brokerage contract is invalid, as being contrary to public policy ... is so elementary that but very few cases involving the question have found their way into the reported decisions; but, whenever the question has been presented, courts have invariably declared that the action could not be maintained.” Morrison v. Rodgers, 115 Cal. 252, 253 (1896).
Marriage brokerage contracts are widely recognized as void and have been so held in all jurisdictions where they have been tested. See Annot. Validity of agreement by which one is to benefit from consent to, or promotion of, marriage between *37 other persons, 72 A.L.R. 1113. Several decisions from other jurisdictions are instructive on the agreed facts of this matter. In White v. Equitable Nuptial Benefit Union, 76 Ala. 251 (1884), citing Boynton v. Hubbard, supra, the Court reasoned that marriage brokerage contracts were void as against public policy because they are “calculated to bring to pass mistaken and unhappy marriages, to countervail parental influence in the training and education of children, and to tempt the exercise of an undue and pernicious influence, for selfish gain, in respect to the most sacred of human relations.” Id. The Illinois Appellate Court in Hellen v. Anderson, 83 Ill. App. 506 (1898) also cited Boynton v. Hubbard as well as the “pernicious tendency” of marriage brokerage contracts, holding that “[a]ll undertakings of such go-betweens as these mercenary matchmakers are reprobated by law.” Id. In In re Grobe’s Estate, 127 Iowa 121 (1905), citing Fuller v. Dame, supra, the Court concluded that “a marriage brokerage contract, pure and simple — such as is deemed by the law to be against public policy, and therefore void.” Id. at 805. In Duval v. Wellman, 124 N.Y. 156 (1891), citing Boynton v. Hubbard, involved a “bonus” provision in the event of marriage similar to the bonus that Rainbow now seeks to collect from Ms. Cui. The Duval court ruled that it is “firmly established that all such [marriage brokerage] contracts are utterly void as against public policy” for the reasons stated in Boynton. Id. Finally, in Johnson’s Adm’r v. Hunt, 81 Ky. 321 (1883), in which the broker agreed to write letters to the intended just as Rainbow agreed to do, the Court observed that marriage brokerage contracts have “always been held void” because, in part, “such contracts, if carried out, result in unhappy marital relations, and have been discountenanced by the law.” Id. at 324-325.
In Kovler v. Vagenheim, 333 Mass. 252 (1955), the Supreme Judicial Court upheld a contract in which the brothers of a woman promised to indemnify her suitor from any money he might be liable for her support and that of any children of the marriage. The Court noted that the contract “was undoubtedly in aid of, and not in derogation of marriage ... the contract provides security for an unimpaired obligation to support There can be nothing contrary to public policy to underwrite the performance of that obligation.” Id. at 254. By contrast the contract which Rainbow seeks to enforce could drive a financial wedge between persons whom otherwise would wed, particularly for persons of limited means. Exposing the defendant to contractual liability arising from her marriage would be undoubtedly in derogation, and not in aid of marriage. The agreement between Rainbow and Ms. Cui is void as against public policy. The judgment for Rainbow is reversed and judgment shall enter for the defendant Ping Cui.
So ordered.

 The contract provided in part that “any disputes regarding this agreement shall be settled in that country in which (1) client holds legal residency and in which client’s spouse holds nationality or in that country in which client’s spouse holds nationality ...” At the time of this action, both Ms. Cui and her husband resided in Massachusetts. Both parties have argued their positions under Massachusetts law and raise no issue regarding choice of law in this appeal.