No. 24,958.

THE TOPEKA LAUNDRY COMPANY, *Appellant,* v. THE COURT OF INDUSTRIAL RELATIONS et al., *Appellees.*

No. 24,959.

THE TOPEKA PACKING COMPANY, *Appellant,* v. THE COURT OF INDUSTRIAL RELATIONS et al., *Appellees.*

SYLLABUS BY THE COURT.

CONSTITUTIONAL LAW—*Restricting Right of Contract—Minimum Wage Law for Women.* To the extent that the industrial welfare statute of this state authorizes the promulgation of orders fixing a minimum wage for adult women, the statute is void, for the reason it contravenes the fourteenth amendment to the constitution of the United States, as interpreted by the supreme court of the United States in the case of *Adkins v. Children's Hospital;* 261 U. S. 525.

Appeals from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed July 11, 1925. Reversed.

*John S. Dean, Harry W. Colmery* and *James E. Smith,* all of Topeka, for the appellants.

*Randal C. Harvey,* of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The actions in the district court were commenced to enjoin enforcement of welfare orders of the court of industrial relations, which fixed minimum wages for adult women employed in laundries and factories. The ground of the actions was that the orders, to the extent stated, and the statute authorizing them, were

---

Constitutional Law, 12 C. J. § 465; Courts, 15 C. J. § 318.

not within the police power of the state, and were violative of the
fourteenth amendment to the constitution of the United States. The
district court sustained the orders, and plaintiffs appeal.

In 1915 the legislature passed an act, sections 1 and 2 of which
read as follows:

"Section 1. That the state of Kansas, exercising herewith its police and
sovereign power, declares that inadequate wages, long-continued hours, and un-
sanitary conditions of labor, exercise a pernicious effect on the health and
welfare of women, learners and apprentices, and minors.

"Sec. 2. That it shall be unlawful to employ women, learners and ap-
prentices, and minors, in any industry or occupation within the state of
Kansas, under conditions of labor detrimental to their health or welfare, and
it shall be unlawful to employ women, learners and apprentices, and minors,
in any industry within the state of Kansas, at wages which are not adequate
for their maintenance, and for more hours in any one day than is consonant
with their health and welfare, except as hereinafter provided." (Laws 1915,
ch. 275.)

To carry out the purposes of the act, an industrial welfare commis-
sion was provided for, to consist of the commissioner of labor and
two other persons, one of whom should be a woman (§ 3). The com-
mission was given authority, on its own initiative or on complaint,
to investigate wages, hours and sanitary conditions affecting women,
learners and apprentices, and minors, in any industry or occupation
in the state, and to that end the commission was given authority to
call for statements and examine pay rolls and other wage records
of employers (§ 5). Employers were required to keep registers of
all women, learners and apprentices, and minors, employed by them,
in such form as the commission might prescribe (§ 6). In making
investigations, the commission was authorized to hold public hear-
ings, at which any employer, employee or interested person might
appear and give testimony. Authority to subpœna witnesses, ad-
minister oaths, compel the production of documents and make and
report findings was conferred (§ 7). If after investigation the com-
mission should be of opinion that in any occupation, wages, hours
and conditions were prejudicial to the health or welfare of any sub-
stantial number of employees, and were inadequate to supply the
necessary cost of living and maintain the worker in health, the com-
mission was authorized to appoint a board composed of representa-
tives of employers, employees and of the public (§ 8). The func-
tion of this board, if a wage board, was to determine the minimum
wage, whether by time rate or piece rate, required in the case of a
woman worker of ordinary ability to supply the necessary cost of

living, and to report its determination to the commission (§ 9). On receipt of the report of the wage board, the commission was authorized to review it, to resubmit its recommendations to the same board or to a new board, or to approve the report in whole or in part. If any recommendation of the board were approved, the commission was required to give notice of a public meeting at which all persons interested might be heard. After such meeting, the commission was authorized to make an order putting the recommendations into effect. Notice to employers of the order was provided for, and they were required, under penal sanction, to post the order in their places of business, and to obey it (§ 10). The commission was authorized to issue licenses authorizing employment of certain classes of persons at a wage less than that fixed by the commission (§ 12). Any employer dissatisfied with an order affecting his business was authorized to bring suit to enjoin enforcement of it (§ 14). Any woman receiving less than the minimum wage was authorized to bring a civil action for the legal wage, notwithstanding her agreement to work for less, and to recover, besides wages, costs and attorney fees (§ 17).

Pursuant to the statute, an industrial welfare commission was appointed, which in the year 1920 instituted a general investigation of wages, hours and working conditions of women in this state. Cooperation of the women's bureau of the United States department of labor was secured in making the survey. The information obtained in the course of the investigation was compiled, and is contained in a report published in 1921, under the title "Women's Wages in Kansas," as bulletin No. 17 of the women's bureau of the United States department of labor.

At its session in 1921 the legislature abolished the industrial welfare commission and conferred the authority which it had possessed upon the court of industrial relations. Sections 3, 5 and 7 of the act read as follows:

"Sec. 3. That section 3 of chapter 275, Session Laws of 1915, be amended as follows: Sec. 3. That the court of industrial relations may establish such standard of wages, hours and conditions of labor for women, learners and apprentices, and minors, employed within this state as shall be held hereunder to be reasonable and not detrimental to health and welfare: *Provided, however,* the court may establish different minimum hours and standards for each class in an occupation of different localities in the state, when, in the judgment of the court, the different conditions obtaining justify such action.

"Sec. 5. That section 8 of chapter 275, Session Laws of 1915, be amended as

Topeka Laundry Co. v. Court of Industrial Relations.

follows: Sec. 8. That if after investigation the court of industrial relations is of the opinion that in any occupation the wages, hours and conditions, sanitary and otherwise, are prejudicial to the health or welfare of any substantial number of the classes of employees named in this act and are inadequate to supply the necessary cost of living and to maintain the worker in health, it shall publish a notice, not less than once a week for four successive weeks, in the official state paper, that it will, on a date and at a place named in said notice, hold a public meeting at which all persons will be given a hearing; and, after said publication of said notice and said meeting, the court of industrial relations may, in its discretion, make and render such an order as may be proper or necessary, and require all employers in the occupation affected thereby to observe and comply with such determinations and said order. Said order shall become effective in sixty days after it is made and rendered, and shall be in full force and effect on and after the 60th day following its making and rendition. The court of industrial relations shall, in so far as it is practicable, mail a copy of any such order to every employer affected thereby; and every employer affected by any such order shall keep a copy thereof posted in a conspicuous place in each room of his establishment. That whenever wages, hours or conditions of labor have been made mandatory in any occupation, upon petition of either employers or employees, the court of industrial relations may at its discretion reopen the question.

"Sec. 7. The order of the industrial court under the provisions of this act may be reviewed in the same manner as is now provided for the review of its decisions by chapter 29 of the Session Laws of 1920." (Laws 1921, ch. 263.)

Under an order of the court of industrial relations, the women's division made an investigation relating to the cost of living of wage-earning women in Kansas, the result of which was reported to the court in August, 1921, under the title "Cost of Living Survey of Wage-earning Women of the State of Kansas." Subsequently the court ordered hearings to be held in various cities of the state. At these hearings the two surveys were introduced in evidence, and employers were permitted to cross-examine and to introduce evidence in their own behalf. At the conclusion of the hearings and on April 11, 1922, the court of industrial relations made a preliminary finding that in certain occupations, including laundries and factories, the wages, hours and conditions were prejudicial to the health and welfare of a substantial number of female employees, and the wages were inadequate to supply the necessary cost of living and maintain the workers in health. A public hearing was ordered, which, after due notice, was held on May 9, and on May 19, 1922, the orders in controversy were promulgated. They require that adult women employed in laundries and factories be paid a minimum wage of $11 per week.

The actions to enjoin enforcement of the orders were commenced

on July 17, 1922. At the trial in the district court qualification of plaintiffs to maintain the actions was not contested, and is not contested here. The Topeka Laundry Company employed experienced workers who were not able to earn the minimum wage. The order interfered with carrying out a plan to reorganize the business of the company, and, as one effect, would require additional payment of an aggregate sum of $10 per week to one grade of employees. The company was required, pending the suit, to deposit in court for the benefit of employees the difference between wages paid and the minimum wage. The Topeka Packing Company likewise employed experienced workers who were not able to earn the minimum wage. The order affected its wage scale to the extent that its weekly deposits in court varied from small amounts to as much as $24 per week. Whether or not the minimum wage established by the orders be regarded as conservative, each plaintiff would be subject to prosecution and fine for misdemeanor for each person employed at any sum less than the minimum wage. Plaintiffs are not obliged to conduct their business under such restraint unless the restraint be legal, and in this instance legality or illegality depends on the interpretation to be given the fourteenth amendment to the constitution of the United States.

Whether or not social and economic conditions in the state of Kansas in fact demanded enactment of the minimum-wage law is not a judicial question. The legislature was constituted to determine whether the general welfare would be promoted by such a measure, and any reasonable basis of fact is sufficient to satisfy constitutional requirement. Likewise, whether social and economic conditions have been bettered by enactment of the law is not a judicial question. The questions are, whether the statute is embraced within the legislature's constitutional power to enact laws relating to the general welfare, and if so, whether the means employed have any reasonable relation to accomplishment of the legislative purpose. If the court were free to exercise its independent judgment, it would answer these questions in the affirmative, and would hold the statute and the orders made pursuant to it to be valid. The court is not free, however, to deal with the subject independently. The supreme court of the United States is final interpreter of the constitution of the United States. Its decisions interpreting the constitution are binding on this court, and the decision in the case of *Adkins v. Children's Hospital*, 261 U. S. 525,

Topeka Laundry Co. v. Court of Industrial Relations.

holding the minimum-wage act of congress for the District of Columbia to be violative of the fifth amendment to the constitution of the United States makes it necessary for this court to declare the minimum-wage law of this state to be void as contravening the fourteenth amendment.

The power of congress to make laws for the District of Columbia and the power of the legislature to enact statutes for this state are, for all purposes of this case, equal, and the limitations upon the power of each legislative body are the same. Neither one may deprive any person of life, liberty or property without due process of law. The declared purpose of the act of congress was:

"To protect the women and minors of the district from conditions detrimental to their health and morals, resulting from wages which are inadequate to maintain decent standards of living; and the act in each of its provisions and in its entirety shall be interpreted to effectuate these purposes."

The declared purpose of the state statute has been quoted. While the phraseology is slightly different, the purpose of each enactment was the same: to provide protection against the evils of excessively low wages. Each statute undertook to remedy the mischief by fixing a standard below which wages might not be depressed, either because of inequality of bargaining power between employer and employee, or because of lack of vision of the ultimate consequences of hirings at wages insufficient for maintenance of a self-supporting woman in simple decency and working efficiency. The methods by which the wage standards were to be fixed were substantially the same. A body was provided for, called in the act of congress a board, and called in the first state statute a welfare commission; in the second a court; and now, since abolition of the court of industrial relations, a public service commission. This body was to proceed in accordance with the best traditions of civil liberty, as we understand it: Investigation leading to definite but tentative conclusion, notice to interested parties and opportunity to be heard upon the proposed regulation, a public hearing, promulgation of a final order, and privilege of court review of the order. Special provisions and incidental features of the two statutes are similar, and they are not only identical in all essential respects, but they conform to a recognized standard type of minimum-wage law.

Pursuant to the statutes described, a minimum wage for adult women was regularly established in the District of Columbia and in this state. In the Adkins case the board's order fell because con-

2—119 Kan.

gress had no power to set up governmental machinery whereby liberty of employer and employee to contract with respect to the subject of wages might be interfered with. The necessary conclusion is the legislature of the state of Kansas possesses no such power.

It is of no consequence that this court disapproves the majority opinion and approves the minority opinions delivered in the Adkins case. The decision itself is controlling upon the precise question now before this court. While the decision in the Adkins case stands, it is entitled to respectful observance, precisely the same as though the act of congress had been upheld by a unanimous court. Should time demonstrate that the decision does not represent the settled views of the supreme court of the United States upon this momentous question of constitutional liberty, the law can be reinstated.

An effort is made in the defendant's brief to differentiate the state law, and the orders made pursuant to it, from the act of congress and the orders made for the District of Columbia. It is said the Kansas law is a proper exercise of the police power, justified by conditions shown by the evidence, while the courts found no necessity for such regulation in the Adkins case. The court of industrial relations made no discovery unique in the history of industrial relations. It merely uncovered in Kansas a condition which had previously called for remedy in many states of the United States, and in countries other than the United States—inadequacy of wages to meet the fundamental needs of wage-earning women. Whether the Kansas statute is a product of proper exercise of the police power of the state is the question of law to be decided. Whether the evidence shows the law was providently enacted is beside the question. If, as the court held in the Adkins case, liberty of contract may not be impaired by a minimum-wage law, the court of industrial relations could not bring such a law within the field of operation of the police power by any kind or quantity of evidence. No court has adjudicated that the Kansas law was necessary to remedy conditions in Kansas, and if one should depart from its proper province and do so, its decision would not establish power in the legislature to enact the law.

It is said the act of congress was purely a wage-fixing law, while the Kansas statutes provides an adequate and comprehensive plan to protect health and welfare of women in industry. The act of congress did just what the state statute did. It provided for a minimum standard of wages. The state statute embraced three sub-

Topeka Laundry Co. v. Court of Industrial Relations.

jects: long hours, insanitary conditions, and inadequate wages. Standards of tolerable hours and safe and healthful working conditions have long been staple subjects of legislative cognizance. In Australia, in the early 1890's, it was conceived that something was needed to mitigate the evils of sweating, and agitation of the subject resulted in a law providing for boards to fix minimum wages in the principal sweated trades. The subject was taken up by social reformers in England, and after a preliminary survey the trades-board act was passed in 1909. Economic conditions in England led to extension of the wage-board system to other than sweated trades. Successful operation of the legislation in Australia and Great Britain, and investigations of the conditions of sweated and poorly paid labor in the United States, created a sentiment in favor of minimum-wage legislation in this country. The sentiment became widespread about the year 1910, and, beginning with the appointment of an investigating commission in Massachusetts in 1911, and the passage of the Massachusetts law of 1912, minimum-wage laws have become common means of completing legislative schemes for protecting and promoting the welfare of wage earners, and thereby the welfare of society in general. (Principles of Labor Legislation, by Commons and Andrews, Rev. ed. 1920; Minimum-Wage Laws of the United States: Construction and Operation, by Lindley D. Clark, Bulletin No. 285, Bureau of Labor Statistics, U. S. Department of Labor.) Speaking generally, statutes regulating hours of labor and conditions of labor with respect to safety and sanitation are valid. Whether the principles of such legislation are capable of extension to the wage contract itself was the very matter presented for determination and determined in the Adkins case, and an unconstitutional expedient cannot be made legitimate by combining it with constitutional measures.

It is said the orders of the court of industrial relations affected those industries only in which work is detrimental to health. Menace to health from nature of the employment is one thing. Menace to health from inadequate wages is a different thing, and, according to the decision in the Adkins case, it may not be dealt with by minimum-wage legislation.

Finally, it is said the orders in the Adkins case were based on the opinions of a partisan board, while the orders here involved were based on evidence before the industrial court. The orders of the court of industrial relations embodied conclusions formed as the

result of investigation, precisely as the orders of the District of Columbia board embodied conclusions formed as the result of investigation, and if the orders in one case rest on opinion, they do so in the other. Whether, however, conclusion in one case was opinion, and in the other was not, is not material. In each instance the constitutional defect is to be found not in the orders, but in the statutes providing for the orders, and the court of industrial relations was not competent to create constitutional power for itself and the legislature by its own findings based on evidence. Besides what has been said, this court is not advised by what warrant the epithet "partisan" is applied to the minimum-wage board of the District of Columbia. Putting a woman on the industrial welfare commission did not make it partisan. It secured to the commission an experience and a comprehension well-nigh indispensable to efficiency, which the commission could not otherwise possess, and the opinion prevails that the model minimum-wage law must provide for representation of interests in fixing minimum wages.

"The highest place in the American scheme of constitutional government is that occupied by investigation. But the investigations required are not merely those of experts, as seems often to be assumed when the term 'scientific' legislation is used. The investigations of experts, such as physicians, engineers, economists, statisticians and lawyers, are likely to end in conclusions that may be ideally perfect from a technical point of view, but not *reasonable* from the constitutional point of view. They do not include *all* of the facts. The latter can be ascertained only through adding the experience and testimony of employers and employees—those who are daily in contact with the facts, and whose common knowledge corrects the narrow knowledge of specialists." (Principles of Labor Legislation, Commons and Andrews, p. 479.)

The judgments of the district court are reversed, and the causes are remanded with direction to grant the injunctions prayed for.

JOHNSTON, C. J., and HOPKINS, J., dissenting.

HARVEY, J. (dissenting) : In determining whether the Adkins case controls the decision in the case before us it should be construed in the light of the facts of that case, and in harmony, if possible, with decisions of the court which announced it and other courts of last resort upon similar questions, and in harmony with the purposes of the constitutional and statutory provisions involved. The function of the supreme court of the United States in passing upon the validity of an act of congress pertaining to the District of Columbia is

like the function of this court in determining the validity of an act of the legislature of this state; hence, as a judicial determination of the question, it is persuasive only rather than authoritative, just as would be the decision of the highest court of another state in interpreting a statute of that state.

In the Adkins case the court was dealing only with a wage-fixing statute as it applies to adult women, while in this case we are dealing with a statute pertaining to hours of service, working conditions and wages of women and minors. The Adkins case deals with adult women employees in hospitals and operating passenger elevators in buildings. In this case we are dealing with the employees in laundries and factories. In this state there has been no order pertaining to the class of employees such as was before the court in the Adkins case. In this case we are dealing with an order fixing the minimum wage of $11 per week for adult women employees. In that case the court was dealing with an order fixing the minimum wages of $16.50 per week. In that case an employee desired to take employment, or continue employment, operating an elevator in a hotel for a limited number of hours per day, under pleasant and satisfactory working conditions, at a wage of $35 per month and two meals per day, which was all she was capable of earning, and the court held she should be permitted to take such employment. In this case there is no employee asking to be permitted to work under satisfactory and agreeable conditions and at a wage less than the minimum. In this case the employers are complaining, largely in an academic manner; that is to say, the evidence discloses that at the time this order was made each of them was paying adult women employees more than the minimum wage named in the order. There is a little difference with reference to apprentices and irregular employees, and perhaps a slight change in the general labor situation between the time of the hearing before the commission and the time of the trial in this case, but these are matters that could have been adjusted by a proper application to the commission, though no such application was made. In the main, the complaint of the plaintiffs in these cases is that their constitutional rights of freedom of contract are theoretically interfered with by the statute and the order of the commission. An examination of the pleadings and evidence in this case convinces me that the plaintiffs have brought this action, not because they are hurt at all by the order in any substantial sense, but largely to have the law nullified because theoretically, as they

claim, it infringes upon their constitutional right of contract as to the amount of wages to be paid.

There is no halo about the constitutional right of parties to contract as to the quantum of wages to be paid which is distinct, fundamentally, from the constitutional right of parties to contract as to hours of labor, or their constitutional right to contract to work under specified conditions. So far as the constitutional rights are concerned, they are just as strong in the one case as they are in the other. The courts generally have upheld reasonable statutes or orders of authorized commissions with reference to the hours of service and working conditions made to promote the general welfare under the police power of the government. (*Holden v. Hardy,* 169 U. S. 366; *Bunting v. Oregon,* 243 U. S. 426; *Muller v. Oregon,* 208 U. S. 412; *Radice v. New York,* 264 U. S. 292.)

Also the courts have generally upheld reasonable statutory provisions or orders similarly enacted or made pertaining to the amount of wages. More than a dozen states have enacted statutes directing the fixing of a minimum wage for women and minors, or authorizing to be fixed, after a hearing, by some board or commission. Arizona, Laws 1917, ch. 38; Arkansas, Laws 1915, ch. 191; California, Laws 1913, ch. 324; Colorado, Laws 1917, ch. 98; Kansas, Laws 1915, ch. 275; Massachusetts, Laws 1912, ch. 706; Minnesota, Laws 1913, ch. 547; North Dakota, Laws 1919, ch. 174; Oregon, Laws 1913, ch. 62; South Dakota, Laws 1923, ch. 309; Texas, Laws 1919, ch. 160; Utah, Laws 1913, ch. 63; Washington, Laws 1913, ch. 174; Wisconsin, Laws 1913, ch. 712.

Many of the other states have taken some steps in that direction. In at least five of the states the constitutionality of such statutes has been questioned in the courts, and the statutes have been invariably sustained. (*State v. Crowe,* 130 Ark. 272; *Holcombe v. Creamer,* 231 Mass. 99; *Williams v. Evans,* 139 Minn. 32; *Stettler v. O'Hara,* 69 Ore. 519; *Simpson v. O'Hara,* 70 Ore. 261; *Larsen v. Rice,* 100 Wash. 642.)

In the other states having similar statutes it appears that their constitutionality has not been questioned. The Oregon cases were appealed to the supreme court of the United States and affirmed by an equally divided court. (243 U. S. 629.) The supreme court of the United States has upheld statutes fixing the amount, the time and manner of payments of wages even of adult men employees.

(*Wilson v. New*, 243 U. S. 332; *Patterson v. Bark Eudora*, 190 U. S. 169; *McLean v. Arkansas*, 211 U. S. 539.)

The primary question as to the validity of any of these statutes is, Does the public good require it? The constitutional rights of individuals yield to the common good when the necessity therefor exists. That is primarily a legislative question as distinct from a judicial one, and the courts should not interfere with the legislative determination of that matter unless it be clearly unnecessary or unjust. Our statute has been in effect ten years. Generally speaking, it has been beneficial both to employees and to employers, and also to the public at large. Employees have been better fed, better clothed, and are more intelligent; employers have better establishments and have made as good or better profits, and the state has had a higher type of citizenship. We should use our judgment as to the validity of this statute, rather than be controlled by a decision of another jurisdiction which at best is persuasive rather than authoritative.