THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOSEPH TIPALDO, Appellant, against FREDERICK L. MOREHEAD, as Warden of the City Prison in the Borough of Brooklyn, Respondent.

(Argued January 22, 1936; decided March 3, 1936.)

234

*Nathan L. Miller* and *Arthur Levitt* for appellant. Legislation fixing wages for adult women violates the freedom of contract protected by the Fifth and Fourteenth Amendments of the Federal Constitution. (*Adkins* v. *Children's Hospital*, 261 U. S. 525; *Adair* v. *United States*, 208 U. S. 174; *Coppage* v. *United States*, 236 U. S. 14; *Truax* v. *Raisch*, 239 U. S. 33; *Prudential Ins. Co.* v. *Cheek*, 257 U. S. 516; *Murphy* v. *Sardell*, 269 U. S. 530; *Donham* v. *West-Nelson Mfg. Co.*, 273 U. S. 657; *Tyson* v. *Banton*, 273 U. S. 418; *Ribnik* v. *McBride*, 277 U. S. 350; *Wolff* v. *Court of Industrial Relations*, 262 U. S. 522; *Williams* v. *Standard Oil Co.*, 278 U. S. 235; *Folding Furniture Works, Inc.*, v. *Industrial Commission*, 300 Fed. Rep. 991; *Topeka Laundry Co.* v. *Court of Industrial Relations*, 237 Pac. Rep. 1041; *Stevenson* v. *St. Clair*, 201 N. W. Rep. 628.) The factual background recited in section 550 of the Labor Law (Cons. Laws, ch. 31; L. 1933, ch. 584) involves no new or exceptional circumstances. (*Adkins* v. *Children's Hospital*, 261 U. S. 525; *Coppage* v. *Kansas*, 236 U. S. 1.) Freedom of contract cannot be denied simply because one of the contracting parties is a woman. Such discrimination is a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Federal Constitution. (*Coppage* v. *Kansas*, 236 U. S. 1; *Child Labor Tax Case*, 259 U. S. 20; *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393.)

*Charles J. Campbell* for New York State Hotel Association, *amicus curiæ*. The Minimum Wage Law (L. 1933, ch. 584) so far as it affects adult women, contravenes the Fifth and Fourteenth Amendments of the Constitution of the United States. (*Adkins* v. *Children's Hospital*, 261

U. S. 525; *Wolf Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522; *Murphy* v. *Sardell*, 269 U. S. 530; *Donham* v. *West-Nelson Mfg. Co.*, 273 U. S. 657; *Ribnik* v. *McBride*, 277 U. S. 350; *Tyson* v. *Banton*, 273 U. S. 418; *Folding Furniture Works, Inc.*, v. *Industrial Commissioner*, 300 Fed. Rep. 991; *Topeka Laundries* v. *Court of Industrial Relations*, 119 Kan. 12; *Stevenson* v. *St. Claire*, 161 Minn. 444; *Coppage* v. *Kansas*, 236 U. S. 1; *Truax* v. *Raisch*, 239 U. S. 33; *Prudential Ins. Co.* v. *Cheek*, 257 U. S. 516; *Wilson* v. *New*, 243 U. S. 332; *Fort Smith & Western R. R. Co.* v. *Mills*, 235 U. S. 206.)

*John J. Bennett, Jr.*, Attorney-General (*Henry Epstein, John F. X. McGohey, Benjamin Heffner* and *John C. Crary* of counsel), for respondent. The New York Minimum Wage Law is a valid exercise of the police power. (*Nebbia* v. *New York*, 291 U. S. 502; *McLean* v. *Arkansas*, 211 U. S. 539; *McCulloch* v. *Maryland*, 4 Wheat. 316; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Jacobson* v. *Massachusetts*, 197 U. S. 11; *Mugler* v. *Kansas*, 123 U. S. 623; *Minnesota* v. *Barber*, 136 U. S. 313; *Atkin* v. *Kansas*, 191 U. S. 207; *O'Gorman & Young* v. *Hartford Ins. Co.*, 282 U. S. 251; *Frisby* v. *United States*, 157 U. S. 160.)

*George X. Levine* for Interborough Coat & Apron Supply Association, Inc., et al., *amici curiæ*. The enactment of the Minimum Wage Law was a proper exercise of the police power of the State. It does not contravene the Fourteenth Amendment of the Constitution of the United States. (*Nebbia* v. *New York*, 291 U. S. 502.)

CRANE, Ch. J. The appellant is the manager of a laundry establishment operating in the borough of Brooklyn. Together with three other individuals he was indicted by the grand jury of Kings county for the violation of the Minimum Wage Law for Women (Laws of 1933, ch. 584, in effect April 29, 1933). He was charged with the crime of paying to an adult woman employee a

wage less than that promulgated by the Industrial Commissioner as the mandatory minimum wage applicable to such a woman engaged in that employment, in violation of section 565, subdivision 2, of the Labor Law (Cons. Laws, ch. 31). By this 'habeas corpus proceeding the relator seeks to test the legality of his arrest and imprisonment, raising as the only question before the court the constitutionality of the statute, for the violation of which he has been held for trial. His contention is that the law contravenes the Fourteenth Amendment of the Constitution of the United States, and article I, section 6, of the Constitution of the State of New York, both of which provisions are the same in this particular.

Chapter 584 of the Laws of 1933, thus attacked, is entitled, "An Act to amend the labor law, in relation to the determination and establishment of minimum fair wage standards for women and minors, with provision for the imposition of penalties for the violation thereof." The applicability of the law as to minors is not questioned. The act provides the machinery for determining the minimum wage to be paid women in " an industry, trade or business or branch thereof or class of work therein in which women or minors are gainfully employed, but shall not include domestic service in the home of the employer or labor on a farm." (Labor Law, § 551, subd. 6.) The act defines " an oppressive and unreasonable wage " (§ 551, subd. 7) to be a wage which is both less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health. "A fair wage " (subd. 8) shall mean a wage fairly and reasonably commensurate with the value of the service or class of service rendered. In establishing the fair minimum wage the Commissioner and the wage board may take into account (1) all relevant circumstances affecting the value of the service or class of service rendered; (2) may be guided by like considerations as would guide a court in a suit for the reasonable value of

service rendered where services are rendered at the request of an employer without contract as to the amount of the wage to be paid; and (3) may consider the wages paid in the State for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards.

Section 552 reads as follows: " It is hereby declared to be against public policy for any employer to employ any woman or minor in an occupation in this state at an oppressive and unreasonable wage as defined in section five hundred and fifty-one of the article and any contract, agreement or understanding for or in relation to such employment shall be null and void."

The rest of the act provides for the establishment of a wage board, for hearings, for the determination of the minimum wage, and for the directory order of the Commissioner regarding the payment thereof.

Section 565, subdivision 2, for violation of which the relator has been indicted and imprisoned, reads as follows: "Any employer or the officer or agent of any corporation who pays or agrees to pay to any woman or minor employee less than the rates applicable to such woman or minor under a mandatory minimum fair wage order shall be guilty of a misdemeanor and upon conviction be punished by a fine of not less than fifty nor more than two hundred dollars or by imprisonment of not less than ten nor more than ninety days or by both such fine and imprisonment, * * *."

We do not see wherein this act differs materially from the act of Congress ruled upon in *Adkins* v. *Children's Hospital* (261 U. S. 525), wherein it was held that the Minimum Wage Act of September 19, 1918, chapter 174 (40 U. S. Stat. 960), was an unconstitutional interference with liberty of contract. The interpretation of the Federal Constitution by the United States Supreme Court is binding upon us; we are in duty bound to follow its decisions unless they are inapplicable. We find no

material difference between the act of Congress and this act of the New York State Legislature. The act of Congress, it is said, was to protect women from conditions resulting from wages which were inadequate to maintain decent standards of living. The Attorney-General's brief states it in these words: "The purpose of the statute in the *Adkins* case was to guarantee a wage based solely upon the necessities of the workers. The statute did not provide for the wages to have any relationship to earning power; was applicable to all vocations and not to the character of the work. * * * As contrasted with this statute, the New York Minimum Wage Law provides a definite standard for wages paid. It provides that the worker is to be paid at least the value of the services rendered."

This is a difference in phraseology and not in principle. The New York act, as above stated, prohibits an oppressive and unreasonable wage, which means *both* less than the fair and reasonable value of the services rendered *and* less than sufficient to meet the minimum cost of living necessary for health. The act of Congress had one standard, the living wage; this State act has added another, reasonable value. The minimum wage must include both. What was vague before has not been made any clearer. One of the elements, therefore, in fixing the fair wage is the very matter which was the basis of the congressional act. Forcing the payment of wages at a reasonable value does not make inapplicable the principle and ruling of the *Adkins* case.

The distinctions between this case and the *Adkins* case are differences in details, methods and time; the exercise of legislative power to fix wages in any employment is the same. We should follow the law as given, and not speculate as to the changes which have come or are supposed to have come to economic conditions in the last decade which may move the Supreme Court to a further consideration of its ruling. The *Adkins* case has not been

lightly passed over nor its rulings forgotten. It was cited and followed in *Wolff Packing Co.* v. *Court of Industrial Relations* (262 U. S. 522); *Murphy* v. *Sardell* (269 U. S. 530); *Tyson & Brother* v. *Banton* (273 U. S. 418); *Donham* v. *West-Nelson Mfg. Co.* (273 U. S. 657); *Ribnik* v. *McBride* (277 U. S. 350), and *Near* v. *Minnesota* (283 U. S. 697).

When minimum wage laws somewhat similar to our own have been challenged since the *Adkins* case the courts have felt bound by that decision to declare them unconstitutional without re-examination of the principles involved in these particular statutes. (*Topeka Laundry Co.* v. *Court of Industrial Relations*, 119 Kan. 12; *Folding Furniture Works, Inc.*, v. *Industrial Commission*, 300 Fed. Rep. 991; *Stevenson* v. *St. Clair*, 161 Minn. 444; cf. *Holcombe* v. *Creamer*, 231 Mass. 99.)

The order below should be reversed, the writ sustained, and the prisoner discharged, as chapter 584 of the Laws of 1933, under which he is held, is unconstitutional according to *Adkins* v. *Children's Hospital* (261 U. S. 525).

LEHMAN, J. (dissenting). The appellant is held in custody under an indictment. By writ of habeas corpus proceedings he challenges the legality of his commitment. The indictment charges, we are told, that the appellant, as manager of the Spotlight Laundry, disobeyed a mandatory order, issued by the Industrial Commissioner under article 19 of the Labor Law (Cons. Laws, ch. 31), commonly known as the minimum wage law for women and minors (Laws of 1933, ch. 584) " prescribing certain minimum wages for certain adult women employees of the said laundry; " and that the appellant " conspired to make false entries in the time book of the said laundry for the purpose of making it appear that the said adult women employees did in fact receive the amount of wages," ordered to be paid by the Industrial Commissioner. The wrong charged in the indictment finds its roots in the

statute, and the appellant attacks the statute as unconstitutional and void. The State raises no objections to the form of the attack. It concedes that the appellant's detention is lawful only if the statute is constitutional. That is the only question presented upon this appeal.

Minimum wage laws, i. e., laws which require employers to pay to women and children employed by them a wage which shall not fall below a fixed minimum amount, have been enacted by many foreign countries; and, in the United States, sixteen States have enacted such statutes. So, also, the Congress of the United States in 1918 provided for the fixing of minimum wages for women and children in the District of Columbia. (40 U. S. Stat. 960, ch. 174.) Such a statute constitutes a restriction on freedom of contract protected by the Fifth and Fourteenth Amendments of the Constitution of the United States. On that ground, the Supreme Court of the United States in *Adkins* v. *Children's Hospital* (261 U. S. 525), decided that the provisions of the Federal statute, there challenged at least in so far as they applied to adult women, violated the constitutional limitation upon legislative power. We are told that under that decision and for the same reasons which induced the Supreme Court to declare the Federal statute unconstitutional, we are bound to declare the New York statute void and unconstitutional.

There can be no doubt that the determination in that case that the Federal statute transcended the legislative power of Congress over the District of Columbia, made futile further argument that the statutes enacted by the various States, which were open to the same objections, should be sustained by the courts of those States. The Supreme Court of the United States must construe the provisions of the Constitution and its definition of inviolate rights guaranteed by the Constitution and of the division or restriction of powers thereunder must be accepted by all other courts of the country. A State court may previously have decided the same question.

Such decision is of no effect after the Supreme Court of the United States has construed otherwise the Constitution which binds all, and when the same question arises again in a State court it must follow the decision of the Supreme Court regardless of its own opinion. (*Topeka Laundry Co.* v. *Court of Industrial Relations*, 119 Kan. 12; *Stevenson* v. *St. Clair*, 161 Minn. 444. Cf. *Sparks* v. *Moritz*, 141 Wash. 417.) The effect of the decision, there, is not measured by the persuasive force of the arguments which support it; for under any system of orderly administration of the law, it is the function of the court of last resort to pass finally upon the cogency of conflicting arguments and the weight of conflicting considerations. The effect is not measured by the unanimity or lack of unanimity of the court, for the decision by a majority of one becomes the decision of the court. So Mr. Justice HOLMES, who dissented forcibly in the *Adkins* case, bowed to the decision as a precedent and concurred on that ground alone in later decisions of similar purport. (*Murphy* v. *Sardell*, 269 U. S. 530. Cf. *Donham* v. *West-Nelson Mfg. Co.*, 273 U. S. 657.)

That does not mean, of course, that a court of last resort may not reconsider the same question when it is again presented, and then reach a contrary conclusion. In the light of wider experience, broader information or changed conditions, the weight that should, reasonably, be given to conflicting considerations may change and error may become manifest. A Constitution may be amended only in manner provided therein, but a court which under the Constitution is charged with the duty of construing the Constitution may change its construction when convinced of error. That courts have not been willing to perpetuate a construction after they have been convinced of its unsoundness, has been a source of strength to our system of constitutional government. The Attorney-General, upon this appeal, argues that the statute now under

consideration is free from the objections to the earlier "Minimum Wage" legislation, which the Supreme Court, in the *Adkins* case, held to be in violation of the provisions of the Constitution; but urges, also, that time and experience have demonstrated the soundness of the dissenting opinions there, and that the Supreme Court would now decide differently if the same objections were now presented. What the Supreme Court would now decide rests purely in conjecture, and even though we should assume that a court might under any circumstances properly base decision upon such conjecture, we should certainly hesitate to venture upon such an uncharted and treacherous sea. We start our consideration of the validity of the statute here challenged upon the assumption that the construction placed upon the Constitution by the decision of the Supreme Court in the *Adkins* case is open to attack only in that court. Our personal views of the soundness of that construction then become irrelevant, except in so far as they might, perhaps even unconsciously, dictate our conclusion as to how far such construction should be carried.

Article 19 of the Labor Law, which the appellant now attacks, provides, in section 552 that "It is hereby declared to be against public policy for any employer to employ any woman or minor in an occupation in this state at an *oppressive and unreasonable wage* as defined in section five hundred and fifty-one of the article and any contract, agreement or understanding for or in relation to such employment shall be null and void." The definition contained in section 551 is " ' an oppressive and unreasonable wage ' shall mean a wage which is *both* less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health " (subd. 7). (Italics are ours throughout this opinion.) The same section defines " a fair wage " as " a wage fairly and reasonably commensurate with the value of the service or class of service rendered " (subd. 8).

The statute then provides for the manner in which a " minimum fair wage " shall be fixed in occupations where " any substantial number of women or minors  *  *  * are receiving oppressive and unreasonable wages as defined in section five hundred and fifty-one " (§ 554) and the manner in which employers in such occupations may be induced or compelled to pay the " minimum fair wage " so fixed.

The statute is unquestionably a " price fixing " statute. Ordinarily the price paid for labor, like the price to be paid for goods, is determined by agreement of the parties primarily concerned.  The right by agreement to fix prices, whether of labor or goods, is part of the freedom of which no person may be deprived without " due process of law."  The attack upon the statute is directed mainly to the point that the State violates this constitutional guaranty whenever it attempts to fix a fair wage for adults who are fully competent to enter into contracts fixing wages at a price which they are willing to accept, rather than reject employment offered to them at such wages.  Inextricably interwoven in that attack are objections based upon the method of fixing " minimum fair wages " and the effect of the enforcement of payment of such wages as provided in this statute.  We postpone analysis of the provisions for fixing the " minimum fair wage " and for enforcement of payment, until we have determined the extent of the power of the State to interfere in any form or manner with the free exercise of the right by adults of competent mental ability to fix wages by contract.

" There is, of course, no such thing as absolute freedom of contract.  It is subject to a great variety of restraints. But freedom of contract is, nevertheless, the general rule and restraint the exception; and the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances.  Whether these circumstances exist in the present case constitutes the ques-

tion to be answered." (*Adkins* v. *Children's Hospital, supra,* p. 546.) Thus in the case upon which the appellant here relies, it was authoritatively held that the State under *exceptional* circumstances may place some restraint upon freedom of contract. The difference of opinion in the court concerned only the question of whether the circumstances were so exceptional as to justify, reasonably, the restraints imposed.

The general rules which govern consideration of the validity of a statute which restricts liberty of contract are, indeed, too well established to be challenged now. Liberty of contract is "subject to restrictions passed by the legislative branch of the Government in the exercise of its power to protect the safety, health and welfare of the people." (*McLean* v. *Arkansas,* 211 U. S. 539, 547.) "The guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be obtained." (*Nebbia* v. *People,* 291 U. S. 502, 525.) Liberty to fix by contract the price of labor does not differ in its nature from liberty to fix other terms and conditions of employment though, it may be conceded, that restriction there may encroach more seriously upon the essentials of our economic competitive system. Thus, perhaps, circumstances which might reasonably justify restrictions upon contracts in matters less vital might be insufficient here. Here, too, however, there are many instances where the State has been justified in imposing restrictions under its reserved police power to legislate for the general welfare. The difference then is, at most, one of degree. "Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be

construed in harmony with each other." (*Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 439.) It is with the background of these general rules that we must analyze the provisions of article 19 of the Labor Law now challenged.

The Legislature in section 550 of that article has set forth the conditions which in its opinion called for the exercise of the reserved power of the State: " The employment of women and minors in trade and industry in the state of New York at wages unreasonably low and not fairly commensurate with the value of the services rendered is a matter of grave and vital public concern. Many women and minors employed for gain in the state of New York are not as a class upon a level of equality in bargaining with their employers in regard to minimum fair wage standards, and ' freedom of contract ' as applied to their relations with their employers is illusory. Since a very large percentage of such workers are obliged from their week to week wages to support themselves and others who are dependent upon them in whole or in part they are, by reason of their necessitous circumstances, forced to accept whatever wages are offered them. Judged by any reasonable standard, wages are in many cases fixed by chance and caprice and the wages accepted are often found to bear no relation to the fair value of the service rendered. Women and minors employed for gain are peculiarly subject to the overreaching of inefficient, harsh or ignorant employers and under unregulated competition where no adequate machinery exists for the effective regulation and maintenance of minimum fair wage standards, the standards such as exist tend to be set by the least conscionable employers. In the absence of any effective minimum fair wage rates for women and minors, the constant lowering of wages by unscrupulous employers constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers and threatens the stability of industry. The

246

evils of oppressive, unreasonable and unfair wages as they affect women and minors employed in the state of New York are such as to render imperative the exercise of the police power of the state for the protection of industry and of the women and minors employed therein and of the public interest of the community at large in their health and well-being and in the prevention of the deterioration of the race. In the considered judgment of the legislature this article is constitutional."

The appellant does not challenge these findings of fact by the Legislature, nor does he challenge the statements in the "factual brief" submitted by the respondent to sustain and amplify these findings. Though no reasonable man, today, can doubt the mental capacity of women and though, happily, in this country there are few vestiges of the ancient law which discriminated between men and women and incapacitated women from entering upon independent industrial, business or professional careers, yet it is notorious that in the free competition of such careers they are at a disadvantage with men. The reason may be found in ancient prejudice, in custom, in training or in physical difference. Whatever may be the reason, the fact is patent that often women are willing or forced to accept lower compensation for service than men receive in the same occupation. If wages constitute a "fair and reasonable value of the services rendered," perhaps it would be arbitrary to require an employer to pay more even though such wages be "less than sufficient to meet the minimum cost of living necessary for health." (Cf. *Adkins* v. *Children's Hospital, supra.*) If wages are *both* less than the "fair and reasonable value of the services rendered" *and* less than sufficient to meet the minimum cost of living necessary for health, some element of inequality or oppression may reasonably be found to enter into the bargain.

From wages so fixed a vicious chain of results may follow. The health of the underpaid women suffers, or

they must become a burden upon their families or communities. That is a matter which is certainly of public concern and which might well engage the attention of the Legislature. It is clearly unjust that an unscrupulous employer should obtain the services of his employees upon payment of wages " less than the * * * value of the services rendered " and that the community should bear the burden of his cupidity. True, not all employers who pay such inadequate wages are unscrupulous. In unrestrained competition an employer can seldom afford to increase his costs beyond those paid by his competitors. Thus if in any occupation a considerable number of persons are employed at " oppressive and unreasonable wages " by those willing to profit by the weakness of their employees, more scrupulous employers may be driven to pay the same wages. Competition, however desirable generally, becomes unfair when one employer by the use of practices which, though not unlawful, are unjust and injurious to his employees or to the public, can force his competitors to the wall or compel them to avail themselves of the same practices. It has been held in many cases that under such circumstances the Legislature may, within proper limits, restrain such practices. That is in the interest of proper competition.

The vicious result of oppressive wages does not stop even with the underpaid wage earner. It extends throughout the industry and in lesser degree even beyond the industry. Labor which for one reason or another is deficient in bargaining power has come to be known as " cheap labor," that is, labor which fails to obtain wages commensurate with the value of the services rendered. Just as experience has shown that, in a community where peonage or slavery exists, free labor cannot flourish, so in an industry, or even community, where oppressive wages are paid to those deficient in bargaining power, it is not unreasonable to believe that such wages affect indirectly but nevertheless very substantially the wages of all others.

At least the Legislature might so find. It cannot then be gainsaid that the conditions which the Legislature found to exist call for some remedy. Indeed, the appellant does not seriously argue otherwise. The real question here presented is whether the remedy applied is reasonable and complies with the requirements of "due process," as defined by the Supreme Court, without which there may be no restriction upon liberty of contract.

Here we may profitably examine the prevailing opinion in *Adkins* v. *Children's Hospital* (*supra*) to determine whether the statute now under consideration is subject to the objections which dictated the conclusion of the court in that case. In that case the statute provided for the fixing of standards of minimum wages for women in any occupation adequate " to supply the necessary cost of living to women workers * * * to maintain them in health and to protect their morals." No other standard was there prescribed. It was there said that " while the physical differences [between men and women] must be recognized in appropriate cases, and legislation fixing hours or conditions of work may properly take them into account, we cannot accept the doctrine that women of mature age, *sui juris*, require or may be subjected to restrictions upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances " (p. 553). We accept that statement with all its implications.

The Legislature has then no greater power to restrict the liberty of women than of men. All are equally entitled to the protection of the law, and, in regard to all, liberty of contract is the rule, and restriction can be justified only by exceptional circumstances. What was said by the court can mean only that. None the less, just as in legislation in relation to health, the physical differences between men and women may properly be taken into account so in legislation in other fields, the Legislature cannot reasonably be required to disregard

actual conditions which affect women differently from men. The test in each case is whether the conditions justify the remedy regardless of whether those conditions affect men or women. Classification must of course be based upon actual conditions, not outworn` theories of sex inferiority or superiority. In the *Adkins* case the question was whether the Legislature could require an employer to pay minimum wages to women sufficient to maintain them in good health and to protect their morals, regardless of the value of the service rendered. The court held that such a requirement is unreasonable in its nature and not justified because it is confined to women. In this case the question is whether employers can be compelled to pay women wages which are not " oppressive." There is here no contention that the legislation is justified on the ground that the Legislature may restrict the liberty of women where it could not restrict the liberty of men. The Legislature has found that women are not " *as a class* upon a level of equality in bargaining with their employers in regard to minimum fair wage standards, and ' freedom of contract ' as applied to their relations with their employers is illusory " (§ 550). Undoubtedly there is ground for the belief that women are paid less than men in most occupations. That groups of men may also be paid " oppressive " wages may be entirely true. Perhaps they, too, should be protected by similar legislation. Upon that question we are not now called upon to pass. It is sufficient to point out that here the Legislature has not unlawfully discriminated between groups or sexes. Since it might reasonably be found that in the unrestrained play of economic forces, women as a class are at a disadvantage, with resultant injury to the general welfare, the Legislature might in its discretion adopt legislation, confined to them, which is reasonably adapted to meet the conditions peculiarly affecting them. The distinction is not based upon assumed need to protect the health or morals of women but upon the need of protecting the

public against the evil of " oppressive " wage contracts imposed upon women because of economic conditions peculiarly affecting women. So in this case, as in the *Adkins* case, the fundamental question is whether the remedy is reasonable and appropriate.

In the *Adkins* case the court said that the law forbids " two parties having lawful capacity — under penalties as to the employer — to freely contract with one another in respect of the price for which one shall render service to the other in a purely private employment where both are willing, perhaps anxious, to agree, even though the consequence may be to oblige one to surrender a desirable engagement and the other to dispense with the services of a desirable employee " (p. 554). That criticism might be applied to the earlier statute; it has no application here, for, as we have shown, the Legislature might reasonably find that acceptance of a contract for wages less than the reasonable value for services rendered and less than the minimum cost of healthful living must from its nature be induced by the necessities of the wage earner rather than by any opinion that the employment is " desirable." Then the court said: " the price fixed by the board need have no relation to the capacity or earning power of the employee, the number of hours which may happen to constitute the day's work, the character of the place where the work is to be done, or the circumstances or surroundings of the employment; and, while it has no other basis to support * * * the necessities of the employee, it takes no account of any independent resources she may have " (p. 555). Again, this objection does not apply to the statute now challenged. It has, as we have shown, other basis than the " necessities of the employee." Its basis is rather that wages which bear no fair relation " to the capacity or earning power of the employee, the number of hours which may happen to constitute the day's work, the character of the place where the work is to be done, or the circumstances or surroundings of the employ-

ment;" in other words, relation to all those conditions might enter into the measure of fair compensation for the value of services, are not fair wages; and when in addition, they are insufficient to maintain the health of the employee, such wages are detrimental to the general welfare.

The next source of invalidity in the *Adkins* case is the uncertainty of the standard to be applied in fixing the minimum wages which must be made. There the formula to be applied was the " necessary cost of living to women workers to maintain them in health and to protect their morals." Here the formula to be applied *in fixing wages* is that of " a fair wage " as defined by the statute, *i. e.*, " a wage fairly and reasonably commensurate with the value of the service or class of service rendered " (§ 551, subd. 8). The necessities of the employee do not enter into that standard. True, under the statute, jurisdiction to fix fair wages is made dependent upon a finding that the wages paid to a substantial number of women or minors is " less than  *  *  *   the minimum cost of living necessary for health " (§ 551, subd. 7), but even though, as the Supreme Court has pointed out, the necessary cost of living is not " a precise or unvarying sum," yet obviously there must be a point where determination with reasonable certainty is possible that wages paid are *less* than the necessary cost of living to maintain a woman in good health. Thus the objection to the standard in the statute considered in the *Adkins* case has no application here. We postpone consideration whether similar objections might be raised to the standards to be applied under the present statute until after we have completed analysis of the objections set forth in the opinion in the *Adkins* case.

It is further said in that opinion that " the law takes account of the necessities of only one party to the contract. It ignores the necessities of the employer by compelling him to pay not less than a certain sum, not only whether the employee is capable of earning it, but irrespec-

tive of the ability of his business to sustain the burden, generously leaving him, of course, the privilege of abandoning his business as an alternative for going on at a loss. * * * It compels him to pay at least the sum fixed in any event, because the employee needs it, but requires no service of equivalent value from the employee. It therefore undertakes to solve but one half of the problem. The other half is the establishment of a corresponding standard of efficiency, and this forms no part of the policy of the legislation, although in practice the former half without the latter must lead to ultimate failure, in accordance with the inexorable law that no one can continue indefinitely to take out more than he puts in without ultimately exhausting the supply. * * * To the extent that the sum fixed exceeds the fair value of the services rendered, it amounts to a compulsory exaction from the employer for the support of a partially indigent person, for whose condition there rests upon him no peculiar responsibility, and therefore, in effect, arbitrarily shifts to his shoulders a burden which, if it belongs to anybody, belongs to society as a whole " (p. 557).

Here we reach the crux of the objections which, in the opinion of the Supreme Court, rendered the earlier statute arbitrary and unreasonable and here, too, it is evident that the Legislature, in the new statute, recognized these objections and sought to provide a remedy which should be free from them. . Assuming that it is possible to measure, in accordance with the provisions of the statute, the " value of the service or class of service " rendered, it is clear that a requirement that the employer shall not be permitted to pay less than such value does not " compel the employer to pay a sum which the employee is not capable of earning," nor can it fairly be said that the law compels payment irrespective of the ability of the business to bear the burden, for with the exception perhaps of a business which can exist only through practices which are unfair and economically unsound, a business

must ordinarily be able to bear the burden of paying fair compensation for service given to the business. An employer who pays wages less than that, and less than the cost of healthful living, places upon society the burden of paying part of the legitimate costs of the business.

That these differences are vital appears from the opinion itself in the *Adkins* case, for it continues: " The feature of this statute which, perhaps more than any other, puts upon it the stamp of invalidity is that it exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business, or the contract or the work the employee engages to do. The declared basis, as already pointed out, is *not the value of the service rendered*, but the extraneous circumstance that the employee needs to get a prescribed sum of money to insure her subsistence, health and morals " (p. 558). The exact opposite is true in this case. " The moral requirement implicit in every contract of employment, viz., that the amount to be paid and the service to be rendered shall bear to each other some relation of just equivalence, is completely ignored " in the earlier statute. It is not ignored here. Indeed what the statute aims to do is to declare that " the moral requirement implicit in every contract of employment " cannot be excluded by agreement of parties where through such exclusion the general welfare may suffer. Indeed, the court went further in the *Adkins* case and expressly pointed out that a statute like the one under consideration might not be subject to the objections there held insuperable, saying: "A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, *to pay the value of the services rendered, even to pay with fair relation to the extent of the benefit obtained from the service,* would be understandable. But a statute which prescribes payment without regard to any of these things and solely with relation to circumstances apart from the contract of employment, the business affected by it and

the work done under it, is so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States " (p. 559).

We have assumed, so far, that the provisions for fixing wages are fair and provide a standard which can be applied by administrative officers.  That assumption must now be tested by analysis of the statute itself.  The statute does not require that every employer shall pay a minimum " fair " wage, nor that at his peril and to avoid criminal prosecution, any employer must determine what is a " fair " wage.  An employer must pay such a wage only where such a wage has been fixed for a particular service or class of service in a particular industry by administrative order, and where a further order has been made requiring employers in that industry to pay the minimum wage so fixed.  Such an order may be made only when, on the basis of information in the possession of the Industrial Commissioner or the Director of the Minimum Wage Bureau, the Commissioner is of opinion that " any substantial number of women or minors in any occupation or occupations are receiving oppressive and unreasonable wages as defined in section five hundred and fifty-one." Even then he may not proceed summarily to make an order fixing wages, but must " appoint a wage board to report upon the establishment of minimum fair wage rates for such women or minors in such occupation " (§ 554).

The Minimum Wage Board must be composed of not more than three representatives of the employers in any occupation or occupations, an equal number of representatives of the employees in such occupation or ocupations and not more than three disinterested persons representing the public.  " Within sixty days of its organization a wage board shall submit a report including its recommendations as to minimum fair wage standards for the women or minors in the occupation or occupations the wage standards of which the wage board was appointed to investigate." (§ 555, subd. 4.)   That means " a wage

fairly and reasonably commensurate with the value of the service or class of service rendered. In establishing a minimum fair wage for any service or class of service under this article the commissioner and the wage board without being bound by any technical rules of evidence or procedure (1) may take into account all relevant circumstances affecting the value of the service or class of service rendered, and (2) may be guided by like considerations as would guide a court in a suit for the reasonable value of services rendered where services are rendered at the request of an employer without contract as to the amount of the wage to be paid, and (3) may consider the wages paid in the state for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards" (§ 551, subd. 8).

It is said that the standard of fair value of services is too indefinite for accurate application. It is true that value is ordinarily determined by competitive agreement, and here, it is plain, the Board is required to fix a value different from the value fixed by such agreement. Courts and juries are at times required to fix values when there is no market price, and many price-fixing statutes have been sustained in occupations affected by a public interest, though there, too, the same difficulty may exist. The difficulty is met if some reasonable basis exists for fixing wages. Before a report of the Wage Board becomes effective there must be a public hearing, and only when the Commissioner, after such hearing, has approved, can any order be made fixing the " fair wage." (§§ 556 and 557.) Even then the order remains only directory for nine months. It can be made mandatory thereafter, but only upon a new public hearing. (§ 560.) At any time after an order fixing such wages, whether directory or mandatory, has been in effect a year, there must be a reconsideration of the wage upon the petition of fifty or more residents of the State. (§ 561.) In addition there is a " right of review by the industrial board, and

the courts from any ruling or holding on a question of law included or embodied in any decision or order of the commissioner or the director " (§ 563), and upon such review the reasonableness of any rule or order may be challenged. (Labor Law, art. 3.)

An order so made seems to comply in all respects with constitutional requirements. The Legislature has set a standard which must guide the administrative officers. Though the standard cannot be applied mechanically, it is sufficient in most cases to admit of conclusions reasonably drawn from the evidence presented and which can be tested by application of rules of reason. The statute provides a hearing to all persons affected and a judicial review of the reasonableness of the conclusions drawn. There may, quite possibly, be exceptional cases where no evidence can be produced, from which any conclusion can logically be drawn. Then any person may attack the reasonableness of the finding. No such attack is here made, and an examination of the report of the Wage Board shows ample evidence to support its conclusion.

Doubtless, in the application of the statute, hardship to individuals may at times arise. Argument may be made that economic wrongs are best corrected by the free play of economic forces. Doubtless that consideration has dictated the conclusion of the courts in many cases where statutes restricting competition have been declared unconstitutional. Our economic system is based upon competition, and when we say liberty of contract is the rule and restriction can be justified only by exceptional circumstances, we probably mean just that. None the less, restrictions within reasonable limits and upon reasonable grounds are justified, and so long as the Legislature does not exceed those limitations it must determine whether the price that must be paid for restrictions is justified by the results that may reasonably be expected from such restrictions. It is said that if the court permits the fixing of minimum prices, it must also permit the fixing of maximum prices. The problem is not

so simple. We hold only that in this case the Legislature might reasonably fix minimum prices for women because within the limited field covered by the statute some employers have taken advantage of the economic weakness of women to the public injury. Competition there, it has been found, has been at times illusory, and at times unfair and has worked injury to the general welfare. Whether a law fixing maximum prices could ever be justified by circumstances so compelling as to render the law reasonable is not involved. Price fixing by free contract must remain unrestrained so long as it does not injure the public welfare. In each case the test is whether the restriction is justified and in conformity to " due process."

Here, it may be interesting to observe that in this case no employer or employee has challenged the fairness of the wage fixed or claims it may result in injustice. The Wage Board agreed unanimously upon the amount of a fair wage in the laundry industry. No person appeared at the public hearings to object to the wage so fixed. No person sought a review of the order by appeal to the Industrial Board. The order has been in force for several years and there has been no application for a reconsideration. Even upon this appeal, a brief in support of the law has been filed by a trade association of owners of laundries, and the only person attacking the law is the appellant who has been charged with concealment by false entries of disobedience of the law. In such circumstances it can hardly be said that, at least in so far as concerns the laundry business, the statute or the wage fixing order is unfair or unreasonable. When orders are issued fixing wages of women in other occupations the courts may be called upon to decide whether they are reasonable and justified by the evidence.

We are told that this statute, though enacted primarily for the protection of women, may eventually result in injury to them; for some employers may prefer to employ men if they can obtain male employees for less wages than

the law requires for women employees. That adult male employees of equal efficiency can be obtained at less than the minimum wage fixed for women and minors is contrary to common experience and contrary to the findings of the Legislature. Under these circumstances, that objection is one which the Legislature might reasonably disregard. If in truth it should appear that any substantial number of men have because of price fixing orders supplanted women in any industry, that might be convincing evidence that the orders were unreasonable. No such contention has been made by the appellant.

We are further told that such orders may work hardship to industries in some districts. The statute has provided against that. " 5. A wage board may differentiate and classify employments in any occupation according to the nature of the service rendered and recommend appropriate minimum fair rates for different employments. A wage board may also recommend minimum fair wage rates varying with localities if in the judgment of the wage board conditions make such local differentiation proper and do not effect an unreasonable discrimination against any locality." (§ 555.)

It is argued that the differentiation is permissive, not· mandatory. That may be true, but a permissive right to differentiate becomes mandatory where failure to exercise it would be unreasonable. There as elsewhere the judgment of the Board is subject to judicial review.

We have considered all the objections urged by the appellant or which have occurred to us, though perhaps the consideration of some of these objections rests exclusively with the Legislature. Doubtless some persons may suffer hardship. There may be some women replaced by other women of greater efficiency. Some businesses, which are economically unsound, may be discontinued. Such individual hardships may be the result of any restriction upon competition, but greater hardships of the same kind may be the result also of unrestrained competition, especially where that com-

petition is tainted with overreaching or other unfair practices. The Legislature doubtless weighed these objections, they are not so weighty that a court should say the Legislature could not reasonably find that they are overbalanced by countervailing anticipated benefits.

Can such a statute be declared unconstitutional by the courts? The conditions which the Legislature seeks to remedy are not imaginary. The Legislature might reasonably find that they are caused by oppressive exercise of liberty of contract, and that removal of such conditions is necessary for the general welfare. The remedy devised is reasonably calculated to end those conditions, though perhaps the remedy may carry in its train other evils. The remedy is on the whole not unfair to employers or to employees; though individuals may suffer hardship. Other countries with traditions similar to our own have adopted remedies more drastic to meet analogous conditions. The restriction upon liberty of contract is directed against a harmful and perhaps unfair use of that liberty. The constitutional limitations upon legislative power must be enforced by the court, but they may not be extended beyond their fair meaning. Liberty of contract, like other forms of liberty, must be zealously guarded against invasion by the State, but fear that in the future the State may encroach by unreasonable legislation upon the liberties of the individual cannot justify a present limitation upon the powers of the State, not expressed or clearly implicit in the Constitution. Liberty may be reasonably restrained upon grounds of general welfare. Courts must decide each case upon the facts there presented; upon the facts presented in this case we do not find any ground for saying that the Legislature has acted arbitrarily or transcended the limitations upon its powers.

The order should be affirmed, with costs.

O'BRIEN, HUBBS and FINCH, JJ., concur with CRANE, Ch. J.; LEHMAN, J., dissents in opinion in which CROUCH and LOUGHRAN, JJ., concur.

Ordered accordingly.